John DOE (a pseudonym), Plaintiff,

v.

Irving ANKER, Individually and as Chancellor of the New York City School District, Naomi Poole, Individually and in her representative capacity, Arthur A. Nareff, Individually and in his representative capacity, Frank A. Arricale, II, Individually and in his representative capacity, James Boffman, Individually and in his representative capacity, Ronald King, Individually and in his representative capacity, Stanley Klein, Individually and in his representative capacity, the Board of Education of the City of New York, Joseph Monserrat, Individually and as a member of the Board of Education, James F. Regan, Individually and as a member of the Board of Education, Stephen Aiello, Individually and as a member of the Board of Educa-

James R. Sandner, New York City (A. Michael Weber, New York City, of counsel), for plaintiff.

Allen G. Schwartz, Corp. Counsel of City of New York, New York City (Judith Kawer Kay, New York City, of counsel), for defendants.

OPINION

CANNELLA, District Judge:

After a bench trial, advanced and consolidated with plaintiff's application for a preliminary injunction, defendants are directed to afford plaintiff a hearing on their finding that plaintiff was unfit to teach by reason of mental illness. This action is stayed pending the outcome of the hearing.

FACTS

In September of 1971, plaintiff was licensed and appointed in a New York City High School as a health conservation teacher to instruct students with physical handicaps. On March 8, 1975, upon completion of his probationary period, plaintiff obtained tenure as a teacher of health conservation.

In 1975, plaintiff participated in the teachers' strike, which lasted from September 9 to September 16. Upon return to work, a dispute arose between plaintiff and defendant Klein, the assistant principal, concerning the manner in which plaintiff was conducting his classes. On November 2, 1975, plaintiff wrote a letter to defendant King, the school principal, claiming that Klein was harassing him. On November 5, 1975, King observed one of plaintiff's classes. King's report on this observation, which was provided to plaintiff, criticizes plaintiff's conduct and states in part: "At no time during my stay in the classroom did I observe any evidence of instruction taking place." [1]

On or about November 12, 1975, defendant King submitted to defendant Boffman, then assistant superintendent of high schools, a request for a medical examination of plaintiff. See N.Y.Educ.Law § 2568 (McKinney 1970). The request was accompanied by a document entitled "Report of Reasons for Requesting Medical Examination of Teacher." Plaintiff was provided with a copy of the report. The reasons, as stated by King, included plaintiff's excessive number of absences as well as an earlier observation of plaintiff by King, which "revealed that [plaintiff] was either unable or chose not to conduct any instructional program with his students . . . ." [2]

On or about November 13, 1975, Boffman submitted to defendant Arricale, executive director of the Division of Personnel, a request for a medical examination of plaintiff. On November 14, 1975, Arricale approved the request and referred the matter to defendant Nareff, acting medical director. Defendant Nareff, on or about November 18, 1975, notified plaintiff that he was to appear November 26, 1975 for examination at the Medical Division offices.

On November 21, 1975, defendant King temporarily relieved plaintiff of his teaching duties, as a result of a classroom incident. In a letter to plaintiff, written the same day, King explained the reasons for his decision. He stated that, upon entering plaintiff's classroom in response to a complaint of noise, he "found all of the pupil furniture and the teacher's desk overturned onto the floor." [3] The letter concludes: "I find that your contacts with the students continuously results in disorderly behavior which, at times, is extremely hazardous to the safety and welfare of both yourself and your pupils." [4]

On November 26, 1975, plaintiff was examined by two non-psychiatric staff physicians at the Medical Division of the Board of Education. These doctors recommended that plaintiff be examined by a consultant psychiatrist, known as a "panel psychiatrist."

1. Defendants' Statement of Material Facts as to which there is No Genuine Issue to be Tried, Exhibit 2 (S.D.N.Y., filed January 17, 1978) [hereinafter cited as "Defendants' 9(g) Statement"].

2. Defendants' 9(g) Statement, *supra* note 1, Exhibit 15.

3. *Id.*, Exhibit 3.

4. *Id.*

On December 3, 1975, defendant Boffman observed one of plaintiff's classes. In a letter to plaintiff, as a follow-up to the observation, Boffman criticized plaintiff's failure to prepare written lesson plans and rated his lesson "unsatisfactory." According to Boffman, plaintiff's "failure . . to plan an effective educational program with stated goals, objectives and outcomes for the pupils in [his] charge has resulted in loss of valuable instructional time." [5] Significantly, on December 1, 1975, plaintiff had been placed on penalty probation for a one-year period based upon his participation in the teachers' strike. See N.Y. Civil Serv.Law § 210(2)(f) (McKinney 1973) [the "Taylor Law"].

On December 17, 1975, plaintiff was observed by Hyman F. Cohen, assistant director of the Bureau for the Education of the Physically Handicapped. Mr. Cohen rated plaintiff's performance "very unsatisfactory," and concluded: "The time spent during this period seemed wasteful and unbearable, since there was no plan, purpose, direction or strategy. There was an atmosphere of boredom and uncontrolled freedom to do as one pleased." [6]

That same afternoon plaintiff was examined by Dr. Edward L. Pinney, Jr., the panel psychiatrist, as had been directed by the Medical Division. Dr. Pinney's two-page report to defendant Nareff, dated December 18, 1975, contains the following statement:

It is my belief that [plaintiff] shows residual activity of a paranoid schizophrenic

breakdown that could easily result in difficulty in managing a classroom of children in a public school and in difficulties in relating to his supervisors. Accordingly, I think that he is not fit to function as a teacher in the public school system at this time. [7]

In a report dated December 23, 1975, Nareff recommended to Arricale that plaintiff be placed on "health leave" until April 30, 1976, and that plaintiff be re-examined on or about that time to determine his fitness to return to duty. Nareff's report states in part:

[Plaintiff] has a past history of severe emotional disturbance. It is the feeling of our physicians and the panel psychiatrist that he shows residual activity of a severe emotional disturbance which would result in difficulty in managing a classroom of children and in difficulties relating to his supervisors. [8]

Arricale concurred in the recommendation and, by letter dated December 23, 1975, advised plaintiff that he was being placed on health leave from January 5, 1976, until April 30, 1976. In the letter Arricale stated that the action was based upon the medical director's finding that plaintiff was "[n]ot fit for duty." Defendant Arricale told plaintiff, in this letter, that he would be re-examined in April 1976 and advised plaintiff of his right to an independent evaluation, as provided in the collective bargaining agreement between the Board and the teachers' union. [9] On January 5, 1976,

---

5. Id., Exhibit 5.

6. Id., Exhibit 6.

7. Id., Exhibit 19.

8. Id., Exhibit 21.

9. Id., Exhibit 22. The collective bargaining agreement's medical arbitration clause provides:

Medical Report and Review

a. The report of the Medical Division on a teacher who was called for medical examination shall, upon written request of the teacher, be sent to the teacher's physician within 25 days after the examination.

b. Upon the teacher's request to the Medical Division, his physician shall have the right to examine his medical file.

c. A regular teacher shall have the right to an independent evaluation by a medical arbitrator selected from a panel of doctors to be selected by mutual agreement of the Board and the Union in conjunction with the New York Academy of Medicine if the finding of the Medical Bureau to the Chancellor has resulted in:

(1) Placement of the teacher on a leave of absence without pay for more than one month . . . . .

A request for an independent evaluation of the finding of the Medical Division shall be submitted in writing by the teacher to the Division of Personnel within 10 school days

plaintiff wrote to Arricale requesting an independent evaluation and further requesting that the relied-upon medical reports be made available to Dr. Leonard Feldstein, plaintiff's physician. On January 22, 1976, Nareff sent plaintiff's physician a summary of the findings of the staff physicians and the panel psychiatrist.

On March 22, 1976, plaintiff was re-examined at the Medical Division by two non-psychiatric staff doctors. One doctor determined that plaintiff was not fit, and the other expressed "serious doubts about teacher's ability to teach." [10] Both recommended that any decision await the report of the panel psychiatrist's independent evaluation.

On March 26, 1976, plaintiff was examined by Dr. Aaron Stein, a panel psychiatrist. This was the independent evaluation of the decision to place plaintiff on health leave from January 5 to April 30, 1976, that plaintiff had requested. In a letter to defendant Nareff, dated April 5, 1976, Dr. Stein stated:

As a result of my reading the records concerning [plaintiff], as submitted by you and by him, and as a result of my examination of him on March 26, 1976, and as a result of my consultation with his physician, Dr. Leonard C. Feldstein . . . and the Board Physician, Dr. Arthur A. Nareff . . . I am making the following recommendation:

The medical recommendation of the Medical Board of the Board of Education of [December] 23, 1975 that [plaintiff] be placed on "Health leave from January 5, 1976 to April 30, 1976" is completely concurred in. Details of the medical report which are confidential medical informa-

tion will be sent to Dr. Nareff. Copies of this report will be sent to [plaintiff] . . . .[11]

The "details" of Dr. Stein's medical report have not been made a part of the Court record. By letter dated April 26, 1976, Arricale advised plaintiff that the independent evaluation supported the decision to place him on medical leave until April 30, 1976. In a second such letter of the same date, Arricale informed plaintiff that, upon Nareff's recommendation, plaintiff's health leave had been extended through the balance of the school year. This letter further advised plaintiff that he would be re-examined by the medical bureau in August 1976 to determine his fitness to return to duty the following term. Nareff's recommendation was apparently based upon plaintiff's examination at the medical bureau on March 22, 1976.

By letter to Arricale dated May 10, 1976, plaintiff requested an independent evaluation of the decision to extend his suspension. Plaintiff further requested his psychiatrist be provided a copy of the medical report prepared by Dr. Stein, covering the independent evaluation of March 26, 1976, and a copy of the medical report of the non-psychiatric staff doctors, covering the examination at the Medical Division on March 22, 1976.

On June 18, 1976, plaintiff received a document prepared by defendant King purporting to rate plaintiff's teaching performance "unsatisfactory" for the period from September 3, 1975, through June 30, 1976. The report lists sixteen specific reasons for the unsatisfactory rating, culled principally from the observation reports prepared by defendant Boffman on December 3, 1975, and by Cohen on December 17, 1975.

---

of receipt of notice from the Division of Personnel that he has been placed on leave of absence without pay for more than one month . . . . .

The medical arbitrator shall examine the teacher and consult with the teacher's physician and the Board's physician. The arbitrator's decision shall be rendered within 10 days after he has examined the teacher, and if made within his authority under this agreement shall be accepted as final and binding by the Board and the teacher.

The fee of the medical arbitrator shall be shared equally by the Board and the teacher. Agreement between the Board of Education and United Federation of Teachers, Art. 21(F)(4), at 79–80 (Sept. 9, 1975).

**10.** Defendants' 9(g) Statement, *supra* note 1, Exhibit 28.

**11.** *Id.*, Exhibit 25.

On June 23, 1976, Nareff sent plaintiff's physician a summary of the staff examination of March 22, 1976, and a portion of Dr. Stein's independent evaluation report.

On August 4, 1976, plaintiff was examined at the Medical Division by two non-psychiatric staff doctors. He was accompanied by a union representative who was present during the examination. In a memorandum dated August 10, 1976, Nareff reported to Arricale that, although the examination was not yet complete, the Medical Division's "preliminary judgment in view of [plaintiff's] uncontrolled hostility and erratic behavior is that he will not be fit to return in September." [12]

On September 20 and 22, 1976, plaintiff was examined by Dr. Joseph Sullivan, a panel psychiatrist. Again, a union representative accompanied plaintiff at the interviews. On or about September 24, 1976, Dr. Sullivan sent defendant Nareff an eight-page report of his findings. Dr. Sullivan concluded:

I concur in the Diagnosis of Dr. Pinney. It is my opinion that the teacher does suffer from a Residual Schizophrenia. He does not appear to me to be capable of ordinary conversation. I do agree that there is some problem in a doctor evaluating a teacher's fitness for classroom duties. I do express my own opinion, nonetheless, that I think his capacity for classroom duties on the basis of his mental status is very limited. I certainly am of the opinion that his ability to get along with peers and superiors in the public schools is very limited. It was my opinion that [plaintiff] misinterprets extremely readily. He ascribes motivation to the examiner constantly, which motivation is not there. He shows himself to be emotionally unstable.

I therefore find [plaintiff] not fit at the present time for teaching. [13]

Based upon the findings of Dr. Sullivan as well as the staff doctors, Nareff issued a report September 28, 1976, recommending that Arricale extend plaintiff's health leave through January 31, 1977. Nareff also urged that plaintiff be re-examined in December 1976 to determine his fitness to return to duty. Arricale concurred in the recommendation and so advised plaintiff in a letter written that same day.

The next day, Nareff wrote to Dr. Feldstein, plaintiff's doctor, advising that plaintiff had requested independent evaluation of the decision to extend his health leave from May 1 to June 30, 1976. Nareff enclosed a list of doctors and requested Dr. Feldstein to designate plaintiff's choice of a doctor for the independent evaluation. On October 7, 1976, Nareff wrote a second letter to plaintiff's physician containing Dr. Sullivan's conclusions. In a third letter, dated October 28, 1976, Nareff advised Dr. Feldstein that plaintiff had also requested an independent evaluation of the decision placing him on health leave from September 1976 to January 31, 1977. Defendant Nareff asked whether plaintiff would be willing to have a single arbitration hearing covering both requests.

By letter of November 5, 1976, Dr. Feldstein informed Nareff that plaintiff had selected Dr. Elizabeth Davis to conduct the independent evaluation and that plaintiff would not consent to combining the two requests. Dr. Feldstein also advised defendant Nareff:

I wish to remind you that I am complying with this procedure under protest based upon the professional and ethical considerations concerning which I wrote you on February 22, 1976, in which I stated that, in my judgment, it is highly inappropriate to implicate myself, as therapist to [plaintiff], in an adjudicative role or in a role which gives the appearance of my acting in such a role. [14]

Dr. Davis was unavailable to examine plaintiff until January 1977. On or about January 12, 1977, Dr. Davis examined plaintiff and no formal report or finding was given. By letter to Nareff, dated January

---

12. *Id.*, Exhibit 32.

13. *Id.*, Exhibit 33.

14. *Id.*, Exhibit 38.

24, 1977, plaintiff requested "that these proceedings be halted." [15]

Back in September 1976, plaintiff had received a "Report on Probationary Service of Teacher" prepared by King on September 17, 1976 and approved by Boffman on September 20, 1976. This report rates plaintiff "unsatisfactory" in sixteen of twenty-four categories; rates plaintiff's general fitness "unsatisfactory"; includes seventeen "Additional Comments" detailing other specific allegations of unsatisfactory performance; and concludes with the recommendation that plaintiff's probationary service be discontinued. According to the report, the concluding recommendation was based upon detailed deficiencies in plaintiff's pedagogical performance rather than mental illness or defects in character.

By letter dated September 23, 1976, Boffman advised plaintiff of his recommendation that plaintiff not be granted a certificate of completion of probation; accordingly, plaintiff's employment was to terminate November 30, 1976, at the end of his penalty probationary period. Boffman further informed plaintiff that he was "entitled to the review procedures before the Chancellor as prescribed in Section 105a of the Bylaws of the Board of Education." [16] This same information was also contained in a letter to plaintiff from the executive director of the Division of Special Education and Pupil Personnel Services, dated October 28, 1976, and in a letter from defendant Anker, dated November 29, 1976.

Having been terminated on November 30, 1976, and having decided not to go forward with the independent evaluation, plaintiff commenced in Article 78 proceeding in the Supreme Court of the State of New York on March 16, 1977. In this proceeding, plaintiff challenged the termination of his employment at the end of his penalty probation period. *See* N.Y.C.P.L.R. § 7801 *et seq.* (McKinney 1963).

On May 5, 1977, plaintiff commenced the instant suit, seeking damages, a declaratory judgment and injunctive relief. The complaint alleges that defendants violated plaintiff's rights under the first and fourteenth amendments to the Constitution and 42 U.S.C. § 1983 in terminating his employment and placing him on involuntary health leave. Named as defendants in this suit are Nareff, Arricale, Boffman, King and Klein, in both their individual and representative capacities. Plaintiff also has sued in dual capacities Anker, Chancellor of the New York City school district; Naomi Poole, assistant medical director; and the members of the Board of Education. Additionally named as a defendant is the New York City Board of Education itself.

On September 7, 1977, plaintiff's Article 78 proceeding was dismissed for failure to exhaust his administrative remedies (the 105a hearing) with respect to the termination of his employment.

In the instant case, in lieu of a hearing on plaintiff's application for a preliminary injunction, the parties submitted a Stipulation of Facts. By letter dated December 1, 1977, the Court informed the parties that it would consolidate the motion for a preliminary injunction with trial on the merits. *See* Fed.R.Civ.P. 65(a)(2). Since there appeared to be no genuine issue as to any material fact, the Court also advised that it would deem the matter submitted for judgment. Fed.R.Civ.P. 12(c), 56. In conformity with Federal Rules of Civil Procedure 12(c) and 56, the parties were afforded the opportunity to submit additional materials.

The Court concludes that plaintiff is entitled to a hearing on the decision to suspend him without pay. The action is stayed pending the outcome of the hearing.

## DISCUSSION

Initially, the Court must separate the two distinct actions of defendants challenged in this suit: (1) the placement of plaintiff on "health leave" commencing January 5, 1976; and (2) the termination of plaintiff's employment at the end of his penalty probation period on November 30, 1976.

---

**15.** *Id.*, Exhibit 40, at 7.

**16.** *Id.*, Exhibit 9.

### The November 30, 1976 Termination

■ Defendants' actions in terminating plaintiff's employment, effective November 30, 1976, are not properly before the Court.

Defendants argue that plaintiff is collaterally estopped from relitigating the termination of his employment since this precise issue was tried in the state court action. Fortunately, the Court need not analyze the murky limits of collateral estoppel in civil rights litigation, *see, e. g., Winters v. Lavine*, 574 F.2d 46, at 54–60 (2d Cir. 1978), to decide this issue. For, whether or not the Court gives effect to the state court judgment, plaintiff is required to exhaust his administrative remedies—accept the offered 105a hearing—before he can bring suit under 42 U.S.C. § 1983. *Mitchell v. National Broadcasting Co.*, 553 F.2d 265, 276 (2d Cir. 1977); *James v. Board of Education*, 461 F.2d 566, 570–71 (2d Cir.), *cert. denied*, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972).

### The Suspension Without Pay beginning January 5, 1976

By letter dated December 23, 1975, Arricale advised plaintiff that he had approved Nareff's recommendation that plaintiff be placed on "health leave" from January 5 to April 30, 1976 because plaintiff was "not fit for duty." Eschewing defendants' euphemism, plaintiff was suspended without pay. Plaintiff claims that the procedures defendants employed to accomplish this suspension denied him due process of law. In opposition, defendants raise a number of defenses said to bar the suit. In the alternative, defendants argue that plaintiff had no right to due process of law because their conduct denied him neither liberty nor property.

### Subject Matter Jurisdiction

■ Defendants argue that the Board of Education and its members sued in their official capacities are not "persons" within the meaning of 42 U.S.C. § 1983. It is settled law in this circuit that, in an action for injunctive or declaratory relief, defendants sued in their official capacities are "persons" for § 1983 purposes. *Monell v. Department of Social Services*, 532 F.2d 259, 264–65 (2d Cir. 1976), *cert. granted*, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977); *Arthur v. Nyquist*, 573 F.2d 134 at 137–140 (2d Cir. 1978). Additionally, plaintiff appears to state a valid cause of action against the members of the Board of Education, in their official capacities, directly under the fourteenth amendment. *Gentile v. Wallen*, 562 F.2d 193, 196–97 (2d Cir. 1977). The Court's preliminary holding—that plaintiff is entitled to a hearing—does not require it to reach the question whether damages are ultimately available. However, there does not appear to be any legal impediment to recovery of compensatory or punitive damages from defendants in their personal or individual capacities in a suit brought under 42 U.S.C. § 1983. *See Zarcone v. Perry*, 572 F.2d 52 at 54–55 (2d Cir. 1978).

### Plaintiff's Property Interest

■ Defendants argue that, by virtue of plaintiff's status as a probationary teacher at the time he was suspended, he had no property interest in continued employment. Thus, citing *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), defendants claim that plaintiff was not entitled to a hearing on the suspension of his employment. *See Rocker v. Huntington*, 550 F.2d 804 (2d Cir. 1977). The mere fact of plaintiff's probationary status, however, does not preclude further inquiry. Indeed, the Supreme Court noted in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976),

> that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the state seeks to remove

or significantly alter that protected status.

*Id.* at 710–11, 96 S.Ct. at 1165 (footnote omitted). If, despite his probationary status, plaintiff had a "legitimate claim of entitlement," *Roth, supra,* 408 U.S. at 577, 92 S.Ct. 2701, to continued employment, then due process required a hearing to be held before he could be suspended.

At the time he was suspended, plaintiff was a probationary employee only by virtue of his participation in the teachers' strike. *See* N.Y. Civil Serv.Law § 210(2)(f) (McKinney 1973) [the "Taylor Law"]. In *Tuller v. Central School District No. 1,* 40 N.Y.2d 487, 387 N.Y.S.2d 87, 354 N.E.2d 826 (1976), the New York Court of Appeals discussed the status of teachers during such a penalty probation period. After noting that, under the applicable provisions of the New York Education Law, "a probationary teacher may be discharged without a hearing at any time," 40 N.Y.2d at 492–93, 387 N.Y.S.2d at 89, 354 N.E.2d at 828–29, the court stated:

> We agree . . . that section 210 of the Taylor Law requires us to substitute for the minimal protections of the Education Law the more elaborate rights during a penalty probation which other non-teaching civil service employees receive. That substitution accords with section 210's specific requirement that its punitive effect on teachers "shall not exceed" what other civil service employees suffer. The applicable protections . . . [provide] that an employee may not be discharged *during* probation except for misconduct or incompetence and then only after a hearing . . . .

40 N.Y.2d at 493, 387 N.Y.S.2d at 89–90, 354 N.E.2d at 829.

■ The *Tuller* decision makes clear that, under New York law, plaintiff's employment could not be terminated without a hearing before November 30, 1976—the end of his penalty probation period. Therefore, defendants' suspension of plaintiff without pay and without a hearing, effective January 5, 1976, denied plaintiff property without due process of law.[17]

*Plaintiff's Liberty Interest*

■ Plaintiff claims that defendants' actions in finding him not fit for duty by reason of mental illness denied him the liberty interest in his good name and reputation without due process of law. The Court agrees.

This finding follows from the opinion of the Second Circuit in *Lombard v. Board of Education,* 502 F.2d 631 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). In that case the Board of Education of the City of New York (a defendant in this suit) terminated plaintiff's probationary employment as a teacher based upon a finding of mental unfitness. In reversing the district court's summary dismissal of the complaint, Judge Gurfein, writing for a unanimous panel, reasoned:

> Though Lombard did not have tenure and, therefore, presumptively had no property right either as a probationary or substitute teacher, . . . he was deprived of his reputation as a person who was presumably free from mental disorder. Without his being given the right to confront witnesses, the termination of his probationary employment was recommended by the Committee of the Superintendent on the primary ground: "I. Illogical and disoriented conversation, causing request for examination by the Medical Department, which found him unfit for duty."
>
> This is not only a finding but a stigma. If it is unsupportable in fact, it does grievous harm to appellant's chances for

---

17. Plaintiff also argues that, in reviewing his suspension, the Court should treat him as a tenured teacher. The basis of his argument is the fact that both the direction to submit to a medical examination and the medical examination that resulted in plaintiff's suspension occurred in November 1975 when plaintiff was a tenured teacher. The examination by Dr. Pin-

ney and the determination to suspend plaintiff, however, occurred in December 1975, during the penalty probation. The Court would be inclined to hold that, on December 1, 1975, all of plaintiff's tenure rights were extinguished. However, having found that plaintiff had a property interest as a probationary teacher, the Court does not reach this argument.

further employment, as indeed the record demonstrates, and not only in the teaching field. For that reason he was entitled to a full hearing.

. . . A charge of mental illness, purportedly supported by a finding of an administrative body, is a heavy burden for a young person to carry through life. A serious constitutional question arises if he has had no opportunity to meet the charge by confrontation in an adversary proceeding.

*Id.*, 502 F.2d at 637–38 (citations omitted); cf. *Newman v. Board of Education*, 508 F.2d 277 (2d Cir.), cert. denied, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975).

Later cases in the courts of appeal and the Supreme Court have elaborated on the type of governmental defamation that amounts to a denial of liberty. In *Arnett v. Kennedy*, 416 U.S. 134, 157, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (1974), for example, the Court observed that "liberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee." In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Court reiterated that " '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the [Due Process] Clause must be satisfied. . . ." 419 U.S. at 574, 95 S.Ct. at 736, quoting *Wisconsin v. Costantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

A further refinement was added in *Paul v. Davis*, 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976), wherein the Court interpreted earlier opinions as imposing an additional requirement:

In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment.

Less than three months after the decision in *Paul v. Davis*, the Court again faced a claimed denial of liberty in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Apparently imposing a publication requirement, the Court stated:

it would stretch the concept too far "to suggest that a person is deprived of 'liberty' when he is simply not rehired in one job but remains as free as before to seek another." [*Board of Regents v. Roth*, 408 U.S. 564, 575, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)]. This same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge.

In this case the asserted reasons for the . . . decision were communicated orally to the petitioner in private . . . . Since the . . . communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his "good name, reputation, honor or integrity" was thereby impaired.

426 U.S. at 348, 96 S.Ct. at 2079 (footnote omitted).

Perhaps the Court, in emphasizing the oral nature of the communication in *Bishop v. Wood*, was influenced by the late Mr. Justice Clark's Opinion in *Velger v. Cawley*, 525 F.2d 334 (2d Cir. 1975), rev'd on other grounds sub nom. *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam). In that case, the Second Circuit held that the dismissal of a probationary policeman, accompanied by allegations in his personnel file that he had attempted suicide, entitled the policeman to a hearing to confront the allegations. 525 F.2d at 335–36. Mr. Justice Clark, sitting by designation and writing for a unanimous panel, found that a stigma had attached because of Velger's dismissal. The court noted that

New York City admits that it grants ready access to its confidential personnel files to all governmental police agencies . . . [and that] New York City answers all inquiries for permission to see

personnel files with the suggestion that inspection will be permitted with the consent of the dischargee. 525 F.2d at 336. The court found "the record reeks of the stigma that attached to Velger," *id.*, because

the manner in which personnel records are made available to the inquiring public and private employers insures that serious derogatory information in the file will stigmatize the dischargee.

525 F.2d at 336–37. The court observed that a hearing would not be required if appellee's changed "their disclosure procedures to prevent the dissemination of derogatory and possibly stigmatizing allegations . . . ." 525 F.2d at 337. The opinion seemingly infers publication from evidence of certain routine government practices.

The requirement that the defamatory information be made public was the basis of the Second Circuit's recent decision in *Gentile v. Wallen*, 562 F.2d 193 (2d Cir. 1977). In that case, the Second Circuit found plaintiff's allegations of publication inadequate to trigger due process rights. Referring to an alleged statement by the school board treasurer to the state unemployment office that the teacher plaintiff was discharged for misconduct or misrepresentation, the court stated,

it may be that no publication was involved—only a confidential communication with an authorized governmental agency—but in any event the communication occurred after appellant was terminated . . . . .

562 F.2d at 197–98. Citing *Paul v. Davis, supra*, the court held that defamation, subsequent to termination of employment, was not a denial of liberty. The court also held that defendants' disclosures during the litigation could not be a basis for the claim. 562 F.2d at 198.

The trail ends where it began, with *Lombard v. Board of Education*, 440 F.Supp. 577 (E.D.N.Y.1977). There, on remand, the district court noted the developments in the law subsequent to the Second Circuit's opinion in the case, 502 F.2d 631 (2d Cir. 1974). *Citing Gentile, supra*, the court found

the plaintiff in this case did not produce any evidence to show that the alleged stigmatizing information was ever made public and the defendant produced credible evidence that it was not. Accordingly, without deciding whether the alleged stigmatizing information was true or false, plaintiff's claim of a deprivation of a liberty interest, in the absence of publication, is without merit and must be dismissed.

*Lombard v. Board of Education*, 440 F.Supp. 577, 582 (E.D.N.Y.1977) (Platt, J.).

The task remains to determine whether defendants' conduct in this case violated plaintiff's liberty interest sufficiently to require defendants to provide plaintiff with a hearing to confront the allegations. The only serious dispute involves the publication requirement. Were the Court writing on a clean slate, it would require defendants to afford plaintiff a hearing on the allegedly false administrative finding of mental unfitness, made under these circumstances, without proof of contemporaneous dissemination by the government of that finding.[18] In any event, the publication requirement was satisfied in this case.

 Defendants' procedures in disclosing their reasons for a finding of unfitness re-

---

**18.** The Court's concern is that the unrebutted finding *itself* may operate to foreclose future employment opportunities even absent contemporaneous publication by the government. As a practical matter, prospective employers inevitably would request plaintiff's permission to make inquiries of his former employers. In this regard, the late Mr. Justice Clark observed:

The dischargee is then placed "between the devil and the deep blue sea"; he loses whatever his choice. Who would employ an applicant who refused to give authorization? Who would employ one who gives authoriza-

tion but whose file suggests that he [suffers from severe mental illness]?

*Velger v. Cawley*, 525 F.2d 334, 336 (2d Cir. 1975), *rev'd on other grounds sub nom. Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam). Indeed, the recent trend toward public access to government documents increases the likelihood of a damaging disclosure. Placed against the competing interest involved—the inconvenience to New York State in affording plaintiff a hearing—the judiciary should not relegate plaintiff to a state court action at some future time while memo-

quire that, upon request of the teacher, the report of the Medical Division be provided only to the teacher's physician.[19] Thus, plaintiff was forced to consent to being defamed before his doctor as a condition to obtaining an explanation for his suspension. Since the information obtained by plaintiff's physician was not necessary for treatment, the information would not be insulated from further disclosure by New York's physician-patient privilege. *See* N.Y.C.P. L.R. § 4504(a) (McKinney Cum.Supp.1977–78); *Mayer v. Albany Medical Center Hosp.*, 56 Misc.2d 239, 288 N.Y.S.2d 771 (Sup.Ct. Rensselaer County 1968), *modified and aff'd*, 37 A.D.2d 1011, 325 N.Y.S.2d 517 (3d Dep't 1971). Finding that the disclosure to plaintiff's physician satisfies the publication requirement, the Court need not inquire further into defendants' cryptic admission that the contents of the documents were disclosed to persons "having a need to know." [20]

▮ For these reasons the Court finds that defendants denied plaintiff liberty without due process of law by creating and disseminating allegedly false and defamatory information about plaintiff in connection with his suspension without pay.

▮ Defendants contend, however, that plaintiff's prior submission of the suspen-

sion issue to binding arbitration, pursuant to a collective bargaining agreement,[21] precludes him from bringing a suit under 42 U.S.C. § 1983. This proposition was rejected four years ago by a unanimous Supreme Court, in a suit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Referring specifically to 42 U.S.C. § 1983, the Court noted that "legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies . . . ." 415 U.S. at 47, 94 S.Ct. at 1019, and rejected the argument that the suit was barred by the doctrine of election of remedies. As the Court explained:

> That doctrine, which refers to situations where an individual pursues remedies that are legally or factually inconsistent, has no application in the present context. In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and stat-

---

ries fade and witnesses become unavailable. Moreover, defendants' wholesale disclosure of the contents of plaintiff's medical file, subsequent to termination of his employment, would not give rise to a federal cause of action. *Gentile v. Wallen*, 562 F.2d 193, 198 (2d Cir. 1977); *see Paul v. Davis*, 424 U.S. 693, 701–10, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

While the Court cannot correct the "numerous individual mistakes . . . inevitable in the day-to-day administration of [agency] affairs," *Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976), in this case the enormity of the error, if indeed a mistake was made, compels the conclusion that some process should be afforded. Here, the government is not charging lateness, incompetence, insubordination or falsification of documents, but rather, schizophrenia and severe emotional disturbance. As the Second Circuit noted,

> Such a charge suggests to most of us such severe mental illness that it deprives one of the capacity to do any job well. It thus differs from the usual derogatory charge that is levelled at the capacity to do a specific job.

*Velger v. Cawley, supra*, 525 F.2d at 336. And, unlike the private oral meeting in *Bishop v. Wood*, the defamatory information here is contained in numerous pages of medical reports in defendants' possession.

Perhaps courts should relax the rigid publication requirement when the content of the allegedly false finding and the manner in which it is preserved creates a great potential for damaging disclosure—especially where the relief requested is a hearing to confront the allegations. *Cf. Paul v. Davis, supra*, 424 U.S. at 709–10, 96 S.Ct. 1155; *Goss v. Lopez, supra*, 419 U.S. at 575 & n. 7, 95 S.Ct. 729; *Arnett v. Kennedy, supra*, 416 U.S. at 157, 94 S.Ct. 1633; *McGhee v. Draper*, 564 F.2d 902, 910 & n. 6 (10th Cir. 1977); *Austin v. Board of Education*, 562 F.2d 446, 449–50 (7th Cir. 1977).

**19.** *See* note 9 *supra*.

**20.** Defendants' 9(g) Statement, *supra* note 1, ¶ 66, at 13.

**21.** *See* note 9 *supra*.

utory rights is not vitiated merely because both were violated as a result of the same factual occurrence.

415 U.S. at 49–50, 94 S.Ct. at 1020 (footnote omitted). Nor, in the Court's view, could the arbitration clause in the collective bargaining agreement be deemed a prospective waiver of the employee's statutory right to sue. 415 U.S. at 51–52, 94 S.Ct. 1011, *citing Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

This reasoning is equally appropriate in suits brought under 42 U.S.C. § 1983. Accordingly, the Court finds that plaintiff's participation in the arbitration procedures of the collective bargaining agreement does not bar his suit in federal court.

Finally, defendants suggest that a hearing in this case would be a meaningless gesture. Even if plaintiff is able to produce favorable medical opinions at the hearing, the contrary opinions of defendants' doctors would remain. Thus, the decision to suspend plaintiff could not be considered arbitrary in view of the substantial evidence already in the record in support of defendants' finding. However, the purpose of the hearing is to afford plaintiff the opportunity to prove erroneous defendants' determination that plaintiff was unfit for duty by reason of mental illness. In view of the determinations made by non-psychiatric physicians employed by defendants and defendants' *ex parte* introduction of medical opinion evidence during the "arbitration," *see United States v. Morgan*, 567 F.2d 479, 495–96 (D.C.Cir.1977); *Doe v. Hampton*, 184 U.S.App.D.C. 373, 384–85, 566 F.2d 265, 276–78 (1977), the Court cannot presume that an independent decisionmaker would determine that the opinions of defendants' physicians were correct.[22]

## CONCLUSION

The Court concludes that defendants denied plaintiff both liberty and property without due process of law.

22. Moreover, the due process clause does not so much require the state to reach the right result as to employ the right procedure. As the Supreme Court recently observed:

[A] purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests.

*Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 1051, 55 L.Ed.2d 252 (1978).

Accordingly, the Court directs that defendants afford plaintiff the opportunity to rebut the finding of mental unfitness at a hearing before an independent decisionmaker. Additionally, at the hearing plaintiff shall be afforded the right (1) to present witnesses and other evidence on his own behalf; (2) to representation by counsel; (3) to cross-examine the witnesses against him; (4) to a decision based only on the evidence presented at the hearing; (5) to a written decision, setting forth reasons; and (6) to have a transcript of the proceeding if he so desires. *See* Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1277–92 (1975).

The hearing shall commence on or before June 15, 1978. This action is stayed pending the outcome of the hearing.

SO ORDERED.