**Warren V. HOPKINS, Plaintiff,**

v.

**The MAYOR & COUNCIL OF the CITY OF WILMINGTON, et al., Defendants.**

**Civ. A. No. 82–677 MMS.**

United States District Court, D. Delaware.

Dec. 26, 1984.

Sheldon N. Sandler, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiff.

Jeffrey S. Goddess, Saul, Ewing, Remick & Saul, Wilmington, Del., for defendants.

1. The amended complaint named as defendants Captain George Lamborn, who scheduled the trial board hearing; Inspector John Johnson, Jr., who suspended Hopkins; Albert Carter, an employee of the City, and Chief Dennis Regan, both of whom sat on the appeal board; and

OPINION

MURRAY M. SCHWARTZ, District Judge.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343. The plaintiff, Sergeant Warren A. Hopkins, was employed by the defendant, the City of Wilmington ("the City") since November 14, 1966, as a member of the Department of Police ("the Department"). On March 26, 1982, Hopkins was arrested by the Wilmington Police on drug charges and immediately suspended from the force without pay. After an administrative hearing and appeal, the Department terminated Hopkins' employment. Hopkins subsequently instituted this action for injunctive, declaratory, and monetary relief against the Mayor and Council of the City of Wilmington and various officers of the City and the Department in their individual and official capacities.[1] He claims that his suspension and eventual termination were effectuated in violation of his rights under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution. The action is presently before the Court on cross motions for summary judgment.

## I. FACTS

For purposes of this motion, the material facts are undisputed. At the time of his discharge, plaintiff was a sergeant in the Detective Division of the Wilmington Police Department with fifteen years of service. In early March, 1982, Detective Dennis Williams, then a subordinate of Hopkins, received information from an unidentified party implicating Hopkins and his girlfriend, Nancy Carter, in drug trafficking.[2] After the information was passed through appropriate police channels, a full investi-

Captain Simon Edwards, Sr., Captain Joseph Pennell and Inspector Stanley Friedman, all members of the complaint hearing board. Docket Item 23.

2. Williams Deposition at 4.

gation was ordered.[3] As a result of this investigation, a warrant was issued authorizing a search of Ms. Carter's residence. On March 25, 1982, police followed Hopkins to Carter's home and waited outside until they were sure the couple was asleep. They returned early the next morning to execute the warrant.[4] A thorough search of the second floor bedroom where Hopkins and Carter were sleeping revealed drugs and drug paraphernalia,[5] some of which were in plain view. Hopkins and Carter were arrested and charged with possession with intent to deliver controlled substances—marijuana and amphetamines,[6]— but the charges against Hopkins were later reduced to simple possession.[7] At 9:30 that same morning, Hopkins was suspended from the force without pay pending a hearing before a complaint hearing board. Although he was personally informed of his suspension, he was not apprised of the departmental charges against him nor was he given an opportunity to discuss the facts or explain his position.

Twenty-five days later, on April 20, 1982, Hopkins received written notification that a trial board hearing was scheduled for April 28, 1982.[8] Attached to the hearing notice was a letter informing Hopkins for the first time that he was charged with violation of the Department's good conduct regulation[9] because he had been found in possession of marijuana and amphetamines.[10] At the request of Hopkins' attorney, the hearing was postponed until May 13, 1982. It was again postponed until May 25, 1982, for reasons which are in dispute.[11] After the hearing was finally held, the board concluded that Hopkins had been in possession of marijuana. The board found such conduct to be "prejudicial to the good order and best interests of the Police Department" and recommended that Hopkins be dismissed.[12]

Sergeant Hopkins appealed the recommendation to a three member panel that included the Chief of Police, Dennis Regan. Chief Regan had been involved in the earlier investigation of Hopkins and stated in his deposition that at the time of the appeal board hearing he mistakenly believed the trial board determined Hopkins had sold and used drugs, though the trial board

3. Landon Deposition at 3–10; Lamborn Deposition at 4.

4. Pratcher Deposition at 5–7.

5. Police seized a plastic bag containing about a half ounce of marijuana, a vase holding 261 burnt marijuana cigarettes and some white powder later determined to have come from Ms. Carter's diet pills. A scale, rolling papers and other related items were also seized. Appendix to Defendants' Opening Brief ("Defendants' Appendix") at A–4.

6. Carter was also charged with a weapons offense. Appendix to Plaintiff's Opening Brief ("Plaintiff's Appendix") at A–21.

7. Huston Deposition at 12–13.

8. Although the letter is dated April 12, 1982, Hopkins denies receiving it before April 20, 1982. Plaintiff's Appendix at A–30; Plaintiff's Opening Brief at 13. The parties do not contest that this letter was sent with notification of the department charges, dated April 19, 1982, and allegedly received on April 20, 1982.

9. The conduct rule provides: "No member of the Department of Police shall engage in any conduct specifically prohibited in these rules, or contrary to any lawful written or verbal orders or memorandums, or which is prejudicial to the good order, discipline, or efficiency of the Department of Police." Police Department General Conduct Rule, Chapter 11, Rule 201.

10. Plaintiff's Appendix at A–31 to A–33. The charge specified that Hopkins' conduct was "prejudicial to the good order and best interests of the Department of Police" and was "in violation of Title 15 Sections 4754 of the Delaware Criminal Code." *Id.* at A–31 to A–32.

11. Plaintiff alleges that this last postponement resulted from his counsel's request that two of the three individuals assigned to the Trial Board be disqualified for conflict of interests. Plaintiff's Opening Brief at 10. Defendants assert that the conflict issue was resolved without any ensuing continuance, Defendants' Reply Brief at 7, but cannot explain why the hearing was postponed from May 13 to May 25.

12. The Board found the charge of possession of amphetamines to be unsubstantiated because tests showed the white powder found in Carter's bedroom was the equivalent of less than one capsule of a diet drug. Defendants' Appendix at A–8.

found only that Hopkins possessed marijuana.[13] After hearing argument from Hopkins' attorney and the Department prosecutor,[14] the appeal board, on June 29, 1982, upheld the penalty of discharge and Hopkins was dismissed. On July 28, 1982, all criminal charges against Hopkins were nolle prossed by the state prosecutor.

Hopkins subsequently filed this action in federal district court alleging 1) his suspension and termination were effectuated in violation of procedural due process,[15] 2) the Department conduct regulation was unconstitutionally vague and overbroad,[16] 3) the Department action violated his rights to privacy [17] and substantive due process, and 4) the penalty imposed by the Department violated his right to equal protection of the laws.

## II. PROCEDURAL DUE PROCESS

### A. Plaintiff's Property Interest

■ Plaintiff has challenged two distinct actions in this suit: first, his summary suspension without pay, beginning on March 26, 1982, and second, his termination from employment after an administrative hearing and appeal. The propriety of both actions must be tested against the appropriate constitutional framework. As in any procedural due process analysis, the Court must consider whether plaintiff was deprived of a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause and if so, whether the procedures followed complied with the minimum requirements of the Constitu-

tion. The parties do not dispute plaintiff had a constitutionally protected right to continued employment as a permanent employee of the Wilmington Police Department. That right prevented either suspension without pay or termination from his position without due process of law. *See Hayes v. City of Wilmington*, 451 F.Supp. 696, 706 (D.Del.1978); *accord Doe v. Anker*, 451 F.Supp. 241 (S.D.N.Y.1978), *remanded without opinion, Doe v. Sandner*, 614 F.2d 1286 (2d Cir.1979), *cert. denied*, 446 U.S. 986, 100 S.Ct. 2970, 64 L.Ed.2d 844 (1980). There remains the more difficult question whether the process afforded to plaintiff was sufficient for Fourteenth Amendment purposes.

### B. The Suspension Without Pay

Sergeant Hopkins was initially deprived of his right to paid employment with the Wilmington Police Department when he was suspended on March 26, 1982. Hopkins was given no notice of the charges against him [18] and no opportunity to speak on his own behalf. The Department's due process protections were not triggered until over three weeks later when Hopkins received written notification that he was accused of violating the police conduct regulation and that a hearing was scheduled for the following week. Hopkins does not suggest that a full evidentiary hearing should have been held prior to the deprivation, but argues that the Department could not constitutionally dispense with all proce-

---

**13.** Regan Deposition at 6–7, quoted *infra* note 23.

**14.** *Id.* at 6.

**15.** Among the alleged procedural violations, the Amended Complaint charged that the members of the trial board refused to order production of an informant. Docket Item 23. This charge was dropped after oral argument on the motions for summary judgment. *See* Letter from Sheldon Sandler, attorney for plaintiff (June 27, 1984).

**16.** Although plaintiff has never formally dismissed the claim of overbreadth, he has not briefed the issue in response to defendants' motion for summary judgment. The Court considers the argument abandoned and will grant

defendants' motion for summary judgment on this issue.

**17.** Like the claim of overbreadth, the privacy claim was not briefed and is considered abandoned.

**18.** Hopkins' suspension came immediately after the lodging of criminal charges of possession with intent to sell marijuana and amphetamines. He may have assumed that these charges precipitated his suspension. In fact, however, the Department ultimately grounded his suspension only on an alleged violation of the conduct code by virtue of his possession of marijuana. Whether that charge alone would have resulted in immediate suspension has never been determined by the Department.

dural safeguards until twenty-five days after his suspension. The issue is thus whether, despite the existence of post-deprivation process, some earlier additional process was necessary to comport with the constitutional minimum.

 The requirements of notice and an opportunity to be heard at a meaningful time and in a meaningful manner are fundamental to the concept of procedural due process. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The "timing and content of the notice and the nature of the hearing will depend upon an appropriate accommodation of the competing interests involved." *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). As a general rule, an opportunity for notice and "some kind of hearing" must precede the deprivation. *See Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *accord Goss v. Lopez,* 419 U.S. at 582, 95 S.Ct. at 740. Occasionally, however, circumstances warrant immediate government action without pause for extensive procedural precautions. Such action must be measured against the considerations set forth by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine if minimal constitutional requirements are met. Thus, the Court must evaluate: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest including the function involved and the fiscal or administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 333, 96 S.Ct. at 902.

It has been recognized that a city employee's interest in the uninterrupted receipt of his salary and continuation of the benefits of employment is significant. *Hayes v. City of Wilmington,* 451 F.Supp. 696 (D.Del.1978). When deprivation of that interest is temporary in nature, as in the case of a short, finite disciplinary suspension, the impact on the individual is most often less severe than when termination of employment has been imposed. *See id.* at 708. A lesser degree of process is acceptable in connection with a temporary suspension if the government interest is strong and immediacy great.

The distinctions between suspension and termination are blurred, however, where imposition of the former is for an indefinite period culminating in an assessment of whether termination is in order. Indeed, when suspension deprives one of all the benefits of employment, subject to restitution only if the decision was erroneous, the impact on the individual is essentially indistinguishable from the effect of a decision to terminate an employee subject to reinstatement with back pay upon reversal of that decision. *See Thurston v. Dekle,* 531 F.2d 1264, 1272 (5th Cir.1976), *vacated on other grounds,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978). In such instances, the loss of salary for an unknown time period hinders the ability to pursue post-deprivation remedies. Moreover, a suspension which may end in severance leaves the employee uncertain as to whether alternative employment should be sought. For these reasons, it is not surprising that developing case law provides some protection against the risk of an erroneous suspension. *See Hayes, supra; see also Thurston v. Dekle, supra; Bagby v. Beal,* 455 F.Supp. 881 (M.D.Pa.1978), *vacated as moot,* 606 F.2d 411 (3d Cir.1979); *Doe v. Anker, supra.*

The impairment of the employee's personal interest must, however, be balanced against the government interest at stake. The Wilmington Police Department has the important responsibility of protecting the lives and property of Wilmington's citizens. The Department's ability to perform its functions would be hampered by the imposition of excessive pre-suspension procedures that would materially extend the period in which unsuitable employees could remain on the job. Unquestionably, a police officer's involvement with illegal drugs

sheds doubt on his fitness to discharge his duties. Moreover, retention of the officer on the force could pose an undue risk to the individual members of the Department and, in any given case, threaten the integrity of the entire Department.

It may well be that the Department's interests could only have been accommodated by withholding a full evidentiary hearing until after the suspension had been effectuated. Nevertheless, the employee's interests may not be altogether overlooked. The "risk of erroneous deprivation ... through the procedures used" must be weighed against the "probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. A wealth of case law suggests that an extended delay in affording the full panoply of Fourteenth Amendment rights may only be tolerated if adequate precautions are taken in conjunction with the deprivation to minimize the risk of erroneous action. Such precautions generally appear in the form of notice of the charges and at least an abbreviated opportunity to rebut those charges. *See, e.g., Barry v. Barchi*, 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (horse trainer's license could be suspended where prior notice and informal opportunity to present his position were provided); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (social security beneficiary received notification of proposed termination and an opportunity to respond and submit additional evidence prior to termination of benefits); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (civil servant afforded thirty days advance notice of adverse action and opportunity to appear before decision maker prior to effectuation of decision); *see also Thurston v. Dekle*, 531 F.2d 1264, 1273 (5th Cir.1976) ("Where a governmental employer chooses to postpone the opportunity of a nonprobationary employee to secure a full-evidentiary hearing until after dismissal, risk reducing procedures must be accorded. These must include prior to termination, written notice of the reasons for termination and an effective opportunity to rebut those reasons."), *vacated on other grounds*, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978); *Aiello v. City of Wilmington*, 426 F.Supp. 1272, 1289 (D.Del. 1976) ("While a rudimentary confrontation may satisfy the dictates of due process for the purpose of a short suspension in an 'emergency' case, something more may be required prior to an extended unpaid suspension...."); *accord Loudermill v. Cleveland Board of Education*, 721 F.2d 550 (6th Cir.1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 2384, 81 L.Ed.2d 343 (1984); *Louise B. v. Coluatti*, 606 F.2d 392 (3d Cir.1979); *Doe v. Anker*, 451 F.Supp. 241 (S.D.N.Y.1978), *remanded without opinion, Doe v. Sandner*, 614 F.2d 1286 (2d Cir.1979), *cert. denied*, 446 U.S. 986, 100 S.Ct. 2970, 64 L.Ed.2d 844 (1980); *Bell v. Board of School Commissioners*, 450 F.Supp. 162 (S.D.Ala.1978); *but see Ciechon v. City of Chicago*, 634 F.2d 1055, 1059 (7th Cir.1980) (fireman could be suspended for violation of residency requirement without any pre-suspension process; residency a clear cut issue easily documented by tax records, bills, etc., all of which were examined before decision to suspend was made); *Roy v. Jones*, 349 F.Supp. 315, 319 (W.D.Pa.1972) (justice of peace may be temporarily suspended without notice or hearing, pending proceedings on the merits), *aff'd on other grounds*, 484 F.2d 96 (3d Cir.1973).

■ Here, no preliminary measures were utilized to ensure that the Department's action was appropriate. Hopkins was suspended immediately after criminal charges were lodged against him but he was not advised of the interdepartmental violations. Prompt notice of the reasons for Hopkins' suspension, coupled with an informal opportunity to address the charges, would have increased the probability that suspension was appropriate at little cost to the Department. Assuming *arguendo* that there may be circumstances where even rudimentary pre-suspension process is impracticable, the defendants have offered no justification for their failure to provide such process immediately after removing

Hopkins from his position.[19] As the Supreme Court noted in overturning a fifteen-day suspension in *Barry v. Barchi, supra,* "[o]nce suspension has been imposed, the [individual's] interest in a speedy resolution of the controversy becomes paramount." 443 U.S. at 66, 99 S.Ct. at 2650. *Cf. Fusari v. Steinberg,* 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) ("[t]he rapidity of review is an important factor in assessing the sufficiency of the entire process"). An employee should not be expected to forego his salary for an extended period without at least having notice of the charges and an informal opportunity to rebut them.[20] *See Loudermill v. Cleveland Board of Education,* 721 F.2d at 563. On these facts, I conclude that the process afforded Hopkins was insufficient to survive constitutional attack. As to this issue, defendants' motion for summary judgment will be denied and plaintiff's motion will be granted.

## C. Termination From Employment

Plaintiff was afforded a full evidentiary hearing and appeal prior to termination from his position on the police force. He challenges the validity of the hearing board and appeal panel decisions on the grounds that several of the board and panel members were not impartial. Specifically, Hopkins asserts that Inspector Friedman and Captain Edwards, both of whom sat on the hearing board, were exposed to and influenced by department rumors of Hopkins' dealings with drugs. Plaintiff further complains that Chief Regan, the chair of the appeal board, played an integral part in the earlier police investigation of Hopkins' drug involvement and was privy to information not disclosed at the hearing. Moreover, Regan sat on the appeal panel while allegedly under the misapprehension that the trial board recommended a finding that Hopkins had sold, as well as possessed, marijuana. Plaintiff urges the Court to find that the named officials either impermissibly based their conclusions on facts outside the record or inalterably prejudged Hopkins' claim. On this basis, plaintiff attacks not only the fairness of the penalty imposed, but the grounds for the boards' findings that he had committed the offense charged.

Plaintiff cites passages from the depositions of Friedman and Edwards as evidence that both men believed Hopkins had been using drugs, and that Friedman thought Hopkins might have been selling drugs as well.[21] No direct evidence was proffered

19. The defendants have argued that immediate suspension was necessary to prevent Hopkins from using his position to ascertain the source of the charges against him. This argument supports postponement of the required evidentiary hearing until after suspension was effectuated. It does not, however, explain why no notice or informal opportunity to be heard accompanied Hopkins' suspension.

20. The Court need not determine responsibility for the final postponement of the hearing. Even if the hearing were held four weeks after the suspension on its originally scheduled date, the failure to provide some earlier mechanism to reduce the risk of erroneous action would not be eliminated.

21. Inspector Friedman's deposition includes the following colloquy:
Q. How was Sergeant Hopkins' conduct prejudicial to the good order and best interests of the Department of Police?
A. Well, as a police officer we have certain standards that we have to live by, because we go out and enforce the law. We have to maintain a degree higher than getting involved with anyone that would deal in drugs or the use of drugs. And in that direction, he—this would be a violation.
Q. Anything else?
A. Well, if he was using drugs possibly selling drugs, as a police officer you can't have that.
. . . .
Q. Wasn't the conclusion of the trial board that he was in a bedroom where there were drugs?
A. Yes.
Q. And that as a result of that, he was basically in constructive possession of those drugs?
A. Yes.
Friedman Deposition at 19–20 (emphasis added).
Captain Edwards was questioned on the meaning of the specific language used in the board's finding. The Captain stated in reply: "[M]y recollection on that is that we were satisfied that Sergeant Hopkins was in possession of it; and the testimony and evidence at hand, that *we were also satisfied that he probably was using it,* that being the marijuana now." Edwards Deposition at 13 (emphasis added).

at the hearing to implicate Hopkins for more than possession. Plaintiff therefore maintains that the officers' views were based on rumors rather than on the facts before them.

■■■ Evaluation of plaintiff's charge against the trial board members must begin with the presumption that the Department officials are "men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). *Accord Schweiker v. McClure*, 456 U.S. 188 at 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1; *Sedule v. Capital School District*, 425 F.Supp. 552, 561 (D.Del.1976), *aff'd without opinion*, 565 F.2d 153 (3d Cir.1977), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 780, 54 L.Ed.2d 789 (1978). To survive a motion for summary judgment, plaintiff must offer evidence that this presumption has been rebutted. Given the summary judgment procedural context, and drawing all reasonable inferences in plaintiff's favor, it will be assumed that rumors of Hopkins' drug involvement had actually reached the board members.[22] In addition, the depositions raise at least an inference that the officers were influenced by extraneous information. On this evidence, it is impossible for the Court to determine unequivocally whether these individuals should have been disqualified from participation on the trial board.

■■ Unquestionably, the decision to deprive one of a constitutionally protected interest must be made only on the facts of record. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Moreover, due process demands disqualification of a deci-

sion maker who has inalterably determined the outcome of the case before hearing all the facts. *See, e.g., King v. Caesar Rodney School District*, 380 F.Supp. 1112, 1118–19 (D.Del.1974); *see also Simard v. Board of Education*, 473 F.2d 988, 993 (2d Cir.1973). That is not to say that because the board members were cognizant of rumors unfavorable to the plaintiff, they necessarily reached an adverse decision without considering the record. That view would contradict the litany of Supreme Court precedent that requires more than "mere familiarity with the facts of a case" to disqualify a decision maker. *Hortonville Joint School District v. Hortonville Education Association*, 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976). *See also Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *FTC v. Cement Institute*, 333 U.S. 683, 700–03, 68 S.Ct. 793, 803–05, 92 L.Ed. 1010 (1948). Our notions of fairness would, however, be violated if those unsubstantial rumors formed the basis of a decision to deprive one of his constitutionally protected interests. Thus, there remains a factual issue whether Friedman and Edwards had knowledge of inculpating information against Hopkins which was not introduced at the hearing, and if so, whether that information played any part in the trial board's determination. Plaintiff may find it unnecessary to prove those facts at trial in light of the Court's holding in the following discussion concerning the trial board's role in the decision making process. Nevertheless, the existence of a factual question necessitates denial of summary judgment on that issue.

Plaintiff's claim against the bias of the appeal panel stands on a somewhat different footing. Irrespective of his earlier investigative role in the Hopkins' matter,

**22.** Inspector Friedman was aware that Hopkins had been criminally charged with possession with intent to deliver drugs. Friedman Deposition at 16. He has not stated, however, that he knew of any rumors in the Department concerning Hopkins' involvement with drugs. Captain Edwards has not expressed any prior knowledge of the circumstances of Hopkins' case. Since this issue arises on summary judgment, the Court will assume that the rumors did, in fact, reach the officers. Inspector Friedman has, however, affirmatively acknowledged his disavowal of office gossip, Friedman Deposition at 21, and Captain Edwards has expressed his practice of avoiding any conversation connected with the subject of a complaint board hearing. Edwards Deposition at 15.

Chief Regan testified he believed the trial board found Hopkins guilty of both participating in the sale of drugs and possession of drugs.[23] Since his belief as to the former offense could not have come from the hearing itself, plaintiff argues that Regan impermissibly based his decision on facts outside the hearing record or inalterably determined the outcome of Hopkins' appeal before the facts were presented. Plaintiff additionally contends that Regan's "bias" infected the appeal panel as a whole, rendering its decision a nullity.

Defendants do not contest that Regan participated in the appeal process laboring under a basic misapprehension. Instead, defendants urge the Court to ignore the decision of the appeal panel for purposes of this motion, and to bypass the question of Chief Regan's bias. Defendants argue that the Court need only consider whether the trial board hearing satisfied the minimum required by the Due Process Clause. If so, the Department can be guilty of no constitutional violation if it elects to provide more than the minimum procedure, but administers it unfairly.

Defendants' position accurately represents the law in this district:

A ... statute may afford greater procedural protections than the due process clause requires. While ... officials may deviate from that statutory procedure, once a federal court determines that the procedure actually utilized to deprive an individual of a liberty or property interest comports with minimum requirements of due process, the constitutional analysis ceases.... The failure ... to abide by [the] enhanced procedural protection does not rise to a constitutional level. '[I]t is only when the agency's disregard of its rules results in a procedure which in itself impinges upon due process rights that a federal Court should intervene in the decisional processes of state [or local] institutions.'

*Brandywine Affiliate, NCCEA/DSEA v. Board of Education*, 555 F.Supp. 852, 863 (D.Del.1983) (quoting *Bates v. Sponberg*, 547 F.2d 325, 392–30 (6th Cir.1976)). *See also Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983). Nonetheless, I reject defendants' contention that the trial board hearing was in itself sufficient to satisfy the constitutional minimum. In *Hawkins v. Board of Public Education*, 468 F.Supp. 201 (D.Del. 1979), Judge Stapleton emphasized that the plaintiff must have an opportunity to present his case "in a manner which will permit the *decision maker* to weigh both sides." *Id.* at 209 (quoting *Anapol v. University of Delaware*, 412 F.Supp. 675 (D.Del.1976) (emphasis by the *Hawkins* court)). The "decision maker," in the context of a termination hearing, is the individual with the authority to terminate the employees. *Hawkins*, 468 F.Supp. at 209. Under police department practices, the trial board members lacked the authority to fi-

---

**23.** At Regan's deposition, in the context of showing Regan the trial board's decision, the following dialogue occurred:

Q. What was your understanding of the finding against Sergeant Hopkins? What was it that he had done?
A. He had taken part in the drug transactions at a home on the northeast section of Wilmington; that he was in possession of certain items restricted by law. And of course this was all under the umbrella of being a law enforcement officer.
Q. Tell me more about the first part that you stated, if you know anything more, the drug transaction part.
A. Of course, I only know what I hear, now.
Q. And what did you hear?
A. What I heard was that the Police Department had received information that a law enforcement officer Sergeant Hopkins was involved with drugs and an investigation was started at that time by the vice squad and the Internal Affairs section which led to a drug transaction, drug buys at that address. A search warrant was drawn up. The house was—I believe there was a search warrant and an arrest warrant. The warrant was executed and certain things were found in the immediate area by Sergeant Hopkins.
Q. So the basis of your decision upholding the trial board was twofold: one, that he was involved in drug transactions and, two, that he was in a room where there were drugs?
A. Right. Of course, we're talking violations of the rules and regulations of the Police Department. This is the direction we're coming from.

nally determine Hopkins' fate in the Department.

The Rules and Regulations of the Bureau of Police empower the trial board only to *"recommend* to the Inspector of Staff Inspections one of the following actions:

1. The case be remanded for future investigation with specific recommendations.
2. Dismissal of the charge.
3. Finding a charge not sustained.
4. Finding a charge sustained and resulting in one or more of the following actions....

. . . .

e. dismissal from the Department." Rule 304.9 (emphasis added). The results of the trial board must, in all cases be forwarded "to the Chief of Police *for appropriate action."* Rule 304.5 (emphasis added). Nowhere do the rules indicate that the hearing board may, on its own accord, impose any penalty on an employee, other than a twelve-month disciplinary probation as provided in Rule 304.10. Indeed, the rules speak only of the Chief or the appeal board as making such final determinations.[24]

The collective bargaining agreement, read in harmony with the department rules, sheds further light on the trial board's authority. According to the agreement, the board "shall dictate ... the panel's *recommendation* to the Chief, separately, as to each count charged, the penalty, if there is one, and the reasoning behind the decision." Collective Bargaining Agreement, art. XI, § 5 (emphasis added). The board's recommendation must then be forwarded to the employee, who has five days to appeal. *Id.* § 7. *See also* Rule 305.2. In addition, the Chief of Police has ten days after receipt of the board's recommendation to either "approve the recommendation or convene the Appeal Panel." Collective Bargaining Agreement, art. XI, § 8. The agreement thus clarifies what is implicit in the rules—that the Chief must serve as decision maker in the disciplinary process, either alone in reviewing and affirming the trial board's recommendation, or in his position as chair of the appeal panel.[25] Consequently, since only Chief Regan and/or the board on which he sat had the authority to terminate Hopkins, it is inescapable that, on the facts of this case, the appeal board must be considered the decision maker. In the final analysis, any process which was due Hopkins must have been provided by the appeal board.

That is not to say that the Chief of Police could not delegate the responsibility of holding a hearing, analyzing the evidence, and making recommendations. There must, however, be "some assurance that the information tendered was before the decision-maker in some form prior to the decision."[26] *Hawkins,* 468 F.Supp. at 210

---

24. The rules provide: "The Chief of Police, or his designee, may impose suspension upon any member for a justifiable cause or in the best interest of the Department." Rule 304.13. Additionally, the resignation or retirement of a member of the Department does not become effective until approved by the Chief. Rule 304.14. It would be unlikely that the Department intended to rest the authority to effectuate a member's resignation or retirement only in the Chief, while endowing those of a lesser rank with authority to terminate an employee. Finally, the rules provide that "the findings of the appeal board will be the final authority within the Department relative to disciplinary action." Rule 305.4.

25. The Chief may alternatively delegate his duties as a member of the appeal counsel. *See* Rule 305.1(1). Chief Regan did not, however, avail himself of this option in Hopkins' case.

26. Because I find the appeal board's decision invalid as a result of Chief Regan's misapprehensions, I do not pass judgment on whether it was necessary for the appeal board as decision maker to independently review the evidence presented at the administrative trial. If the appeal board relied solely on the arguments of counsel to familiarize themselves with the evidence, I would have grave doubts that the practice could be reconciled with the teaching of *Hawkins.* I note, however, that the deposition of Albert Carter, who also sat on the appeal board, suggests that the panel considered evidence of the articles seized at the time of Hopkins' arrest, and their proximity to Hopkins bedside. *See* Carter Deposition at 6. I also note that Hopkins declined the opportunity to present evidence to the appeal panel, perhaps because he and his attorney proceeded under the assumption that the panel would review pertinent passages of the trial board transcript.

(citations omitted). Moreover the delegation of one's duty to "hear" the evidence does not alter the principle that the actual decision maker must remain impartial. Accordingly, the question of Chief Regan's ability to render a fair decision must be carefully scrutinized.

Upon review of Regan's deposition, it is clear that the Chief not only misunderstood the findings of the trial board, but penalized Hopkins for conduct that had neither been included in the charge nor dealt with at the hearing.[27] The inherent unfairness in such process is obvious. Regan's error creates a situation that is tantamount to the deprivation of a constitutional right without an opportunity to rebut the charges. Unquestionably the constitution prohibits such action. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The fact that Regan's vote was not essential to a majority is immaterial, for the parties agree that the principle of *Berkshire Employees Association v. NLRB,* 121 F.2d 235 (3d Cir.1941), would control. "Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured." *Id.* at 239. The rule of *Berkshire* is particularly compelling where, as here, one of the two remaining decision makers was the subordinate of the potentially biased panel member. I am satisfied Regan's error necessitates invalidation of the decision of the appeal board as a whole.

## III. VAGUENESS

 Plaintiff has made the additional argument that, irrespective of his right to procedural due process, the Department could not, as a substantive matter, apply the police conduct provision to his behavior because of the vagueness of its terms. It is well established that a statute or regulation must be sufficiently specific in its proscriptions to comport with principles of due process. To survive a "void for vagueness" attack, the provision must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly" and "must provide explicit standards" so as to avoid its arbitrary and discriminatory enforcement. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). As is common in the realm of due process law, these standards must be applied with some flexibility: "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Thus, provisions which impose civil rather than criminal penalties or which do not affect constitutionally protected rights are rather leniently scrutinized. *Id.* at 498–99, 102 S.Ct. at 1193–94.

 It is under this relaxed standard that the Court must judge the validity of the police conduct regulation.[28] Assuming *arguendo* that plaintiff has standing to attack the rule on vagueness grounds,[29] he has failed to satisfy the Court of its facial invalidity. The conduct provision must be considered in light of the context in which it was intended to operate. Such generally phrased rules are common in the field of public employment.[30] *See, e.g., Arnett v.*

---

**27.** *See* Regan Deposition at 6–7, reprinted *supra* note 23.

**28.** See *supra* note 9 for the text of the conduct regulation.

**29.** "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974); *accord Aiello v. City of Wilmington,* 623 F.2d 845 (3d Cir.1980).

**30.** The Fifth Circuit has suggested that these general provisions are essential to the civil service:

[I]n private employment, one can be disciplined for almost any reason or for no reason; that this arrangement obtains is generally known. In civil-service employment, by contrast, discharge or discipline must rest on "cause." Fair notice consequently requires some attempt at specifying what actions constitute cause, but it may well be impossible

*Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Lloyd-La Follette Act authorized removal of federal civil servants "for such causes as will promote the efficiency of the service"); *Aiello v. City of Wilmington,* 623 F.2d 845 (3d Cir.1980) (fire department rule proscribed conduct "unbecoming a fireman and a gentleman whether on or off duty," and required employees to "conduct themselves in a manner that will not bring discredit to themselves or to the Department"); *Davis v. Williams,* 617 F.2d 1100 (5th Cir.1980) (fire department rule prohibited "conduct prejudicial to good order"), *cert. denied,* 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980); *Herzbrun v. Milwaukee County,* 504 F.2d 1189 (7th Cir.1974) (welfare department provision permitted suspension or discharge for "acts or omissions unbecoming an incumbent of the particular office or position held"). While perhaps not achieving semantic precision, these rules provide, at the very least, a basic indication of the type of conduct that is prohibited. In this context, the Constitution requires no more. Indeed, the provision may only fail for vagueness if it is void in all of its applications. *Village of Hoffman Estates v. Flipside,* 455 U.S. at 497, 102 S.Ct. at 1192. As the Supreme Court has stated, where " ' "the general class of offense to which ... [the provision is] directed is plainly within [its] terms ..., [it] will not be struck down as vague, even though marginal cases could be put where doubts might arise." *United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954).' " *Arnett v. Kennedy,* 416 U.S. at 159, 94 S.Ct. at 1647 (quoting *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973)). Clearly a police officer who places himself in circumstances that may lead to his being found in constructive possession of marijuana should appreciate that his conduct is "prejudicial to the good order, discipline, or efficiency of the Department of Police." [31]

Plaintiff makes the additional argument that the conduct provision is void as applied since he was found only in "constructive" rather than "actual" possession of marijuana. He asserts that without any knowledge of the presence of contraband, he could not conform his conduct to comply with the Department regulations.[32] Disregarding the questionable validity of plaintiff's factual premise,[33] the argument must fail on the weakness of its legal thesis. The Court understands plaintiff to imply that the conduct regulation must be read to prohibit only knowing or intentional conduct and that plaintiff had no warning that negligent or reckless actions could be disciplined. While it is true that an explicit scienter requirement would mitigate the problem of notice, *Keeffe v. Library of Congress,* 588 F.Supp. 778, 779 (D.D.C. 1984), the Court is not persuaded that plaintiff could not be disciplined under the rule for circumstances which he *should* have known to exist. Accordingly, plaintiff's motion for summary judgment on the vagueness issue will be denied and defendants' corresponding motion will be granted.

---

for the mind to imagine or the hand to transcribe every sort of human misconduct that might fairly call for discipline. And if that were possible, the product would doubtless fill volumes of particulars and therefore go unread—except perhaps by superiors searching out *ad hoc* grounds for disciplinary action already determined on [sic].

*Davis v. Williams,* 617 F.2d 1100, 1103 (5th Cir.1980).

**31.** See *infra* note 33.

**32.** Plaintiff's Reply Brief at 18.

**33.** The notice to plaintiff specified he was charged with conduct which was both "prejudicial to the good order and best interests of the Department of Police" and was "in violation of Title 16 Section 4754 of the Delaware Criminal Code." Plaintiff's Appendix at A–31 to A–32. Section 4754(b) provides: "It is unlawful for any person *knowingly* or *intentionally* to possess, use or consume [marijuana] except as authorized by this chapter." (emphasis added). Although plaintiff denied the charges, the hearing board found them to be substantiated. It thus appears that regardless of plaintiff's protestations to the contrary, the board found he indeed knowingly or intentionally possessed the drug.

## IV. EQUAL PROTECTION AND SUBSTANTIVE DUE PROCESS

The existence of a violation of plaintiff's right to procedural due process obviates the need to consider plaintiff's claim that the Department's decision was not grounded on substantial evidence. It remains for the parties to establish at trial what the appeal board would otherwise have found if proper procedures were adhered to. *See Hawkins v. Board of Public Education,* 468 F.Supp. at 212–13.

Similarly, plaintiff's equal protection claim need not be addressed at this time. That issue must await a decision by the Court, based on the evidence presented at trial, as to whether termination remains in order.

## V. OFFICIAL IMMUNITY

The individual defendants have raised an affirmative defense of official immunity. Under the rule of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the grant of immunity for official action is dependent upon the "objective reasonableness of an official's conduct as measured by reference to clearly established law." *Id.* at 818, 102 S.Ct. at 2739. The *Harlow* standard raises questions of law and fact which have not adequately been addressed by the parties. Consequently, the Court must decline to rule on that issue on summary judgment.

## VI. CONCLUSION

Plaintiff has succeeded in obtaining summary judgment on two elements of his procedural due process claim—first, the denial of pre-suspension process, and second, the failure to provide a hearing before an *impartial* decision maker. Summary judgment will be granted in favor of defendants on the claim that the police conduct provision was unconstitutionally vague. The motions will be denied as to both parties with respect to the procedural claim against the members of the administrative trial board.

The burden now shifts to defendants at trial to prove that the Department would have arrived at the same conclusions had it employed the proper procedural safeguards.[34] *See, e.g., Alexander v. Polk,* 750 F.2d 250, 263–64 (3d Cir.1984). The Court will also consider the remedy necessary to vindicate plaintiff's constitutional rights and will determine whether immunity should be granted to any of the individual defendants. An order will be entered granting summary judgment as outlined above and denying the parties' cross-motions on all other issues.

---

34. By letter dated December 19, 1984, defendants have advised the Court of recent developments in Hopkins' claim for state unemployment benefits. Hopkins' claim was denied at the administrative level because he was found to have been terminated by the Police Department for good cause. Defendants state the Unemployment Insurance Appeal Board concluded as a factual matter that Hopkins had been in knowing possession of marijuana. The Superior Court of the State of Delaware affirmed the Unemployment Board's decision. *Hopkins v. Unemployment Insurance Appeal Board,* No. 83A–OC–13 (Del.Super.1984). The defendants urge that decision should have preclusive effect on the substantive due process and equal protection issues in the district court and on the question whether the Police Department's decision was against the weight of the evidence. The preclusive effect of the Superior Court's decision has not been subject to the adversarial process. Given that this Court must determine at trial both what the Department would have found and concomitant punishment, there seems to be no reason for determining the preclusive effect of the Superior Court affirmance of the Unemployment Insurance Board prior to trial.