Warren V. HOPKINS, Plaintiff,

v.

The CITY OF WILMINGTON, et al., Defendants.

Civ. A. No. 82–677 MMS.

United States District Court,
D. Delaware.

Aug. 20, 1985.

Sheldon N. Sandler, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiff.

Jeffrey S. Goddess, Saul, Ewing, Remick & Saul, Wilmington, Del., for defendants.

## MEMORANDUM OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Plaintiff Warren A. Hopkins has brought this civil rights action under 42 U.S.C. § 1983 challenging his dismissal from the Wilmington Police Department ("the Department"). Defendants are the City of Wilmington[1] and three Police Department employees—John Johnson, George Lamborn, and Dennis Regan.[2] All are sued in their individual and official capacities.

The seeds for this action were sown on March 26, 1982, when Hopkins was arrested on drug charges and immediately suspended without pay from his position as sergeant on the police force. After an administrative hearing and appeal, the Department concluded that Hopkins had violated the police conduct code and that termination from the Department was in order. Hopkins thereafter filed this action for injunctive, declaratory, and monetary relief on the ground that his suspension and dismissal were effectuated in violation of his constitutional rights.

Several of the issues raised in plaintiff's complaint were previously disposed of on cross motions for summary judgment. Specifically, the Court found that the police

---

1. The complaint originally named "The Mayor & Council of the City of Wilmington" as defendants to this action. In the pretrial order, plaintiff substituted "The City of Wilmington" as defendant. Docket Item ("D.I.") 79 at 12.

2. Claims against defendants Simon Edwards, Stanley Friedman, and Joseph Pennell were withdrawn just prior to trial. Trial Transcript ("Tr.") Volume A at 6 ("A–6"). Plaintiff's claim against Albert Carter was withdrawn in post-trial briefing. Plaintiff's Post-Trial Brief, D.I. 87 at 39.

department conduct regulation under which Hopkins was charged was not unconstitutionally vague. The Court determined, however, that Hopkins was suspended from the force without proper notice and a timely hearing in violation of his right to procedural due process. The Court also decided that the Department tribunal which ordered Hopkins' dismissal mistakenly acted upon information not presented at his hearing, thus depriving Hopkins of his right to a hearing before a fair and impartial decision maker. *Hopkins v. Mayor & Council of Wilmington*, 600 F.Supp. 542 (D.Del.1984). That decision shifted to defendant the burden of establishing at trial whether an impartial police tribunal would have found Hopkins guilty of the internal charges against him and whether the penalty of dismissal would have been imposed. Resolution of Hopkins' substantive due process and equal protection claims was reserved for trial along with questions of defendants' official immunity and the damages due Hopkins for the violations of his procedural rights. These issues were tried to the Court from March 11–14, 1985, and post-trial briefing followed. This Opinion constitutes the Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

## I. Background Facts

Plaintiff began his employment with the Wilmington Police Department on November 14, 1966 and was promoted to sergeant in 1972.[3] At the time of his discharge on June 29, 1982, he was assigned to the Detective Division of the Department.

In September, 1981, Hopkins began dating a woman named Nancy Carter. Some-

time thereafter, Hopkins' colleague, Charles Warrick, informed Hopkins of rumors that Carter was involved with drugs.[4] Hopkins denied both his and Carter's drug involvement and continued his relationship with Carter.[5]

About the same time, the Department was investigating Hopkins and Carter for possible drug violations. As a result of that investigation, a warrant was issued to search Carter's residence at 2319 N. Pine Street, Wilmington, Delaware. The warrant was executed early in the morning of March 26, 1982, after police first made certain Hopkins was at the residence with Carter.[6] The police went upstairs to the room where the couple was sleeping and found in plain view an ashtray containing a burnt marijuana cigarette or "roach" and a shoe box lid holding a bag of marijuana and some rolling papers.[7] Also discovered in various places in the room were a vase holding 261 roaches, a mirror with a small quantity of white powder later determined to have come from Carter's diet pills, and some related drug paraphernalia.[8] Hopkins and Carter were arrested and charged with possession with intent to deliver controlled substances—marijuana and amphetamines. The charges against Hopkins were later reduced to simple possession and eventually a nolle prosequi was entered on that charge.[9]

At approximately 9:30 a.m. on the morning of Hopkins' arrest, Captain George Lamborn, acting under orders of Inspector Johnson, suspended Hopkins without pay pending an administrative hearing.[10] Hopkins was neither advised of the internal charges against him nor given an opportunity to explain his side of the story.

---

**3.** Pre-Trial Order, D.I. 79, Admitted Fact 1.

**4.** Defendants' Exhibit ("DX") 1, Testimony of Charles Warrick at 28–30. DX 1 is the transcript of selected portions of Hopkins' hearing before the police complaint board. The tape of that hearing was played at trial and the parties have stipulated that DX 1 shall serve both as a trial exhibit and as the official transcript for the portion of the trial when the recording was played. *See* D.I. 80. References to DX 1 will hereinafter indicate the name of the witness testifying and the pertinent page(s) of the transcript.

**5.** Tr. at D–45.

**6.** Tr. at B–41 to 42, E–102.

**7.** DX 1, Huston at 4, Nancy Carter at 6, 16.

**8.** Plaintiff's Exhibit ("PX") 4.

**9.** DX 1, Huston at 8–9; Tr. at C–29 to 33.

**10.** Tr. at E–96.

On April 20, 1982, twenty-five days after his suspension, Hopkins received written notification that he had been charged with violation of Rule 201, the general conduct provision of the Bureau of Police Rules and Regulations.[11]  The charge stated:

[O]n 26 March 1982, members of Wilmington Dept. of Police Vice Unit executed a search warrant on the premises of 2319 N. Pine St.  While conducting the search of the premises Sgt. Warren Hopkins, (off duty) along with Nancy Carter was observed in a second floor bedroom in possession of a quantity of marijuana.  Such conduct being prejudicial to the good order and best interests of the Department of Police as well as in violation of Title 16 Section 4754 of the Del.Crim.Code.[12]

A hearing was scheduled for April 28, 1982, but was postponed at the request of Hopkins' attorney until May 13, 1982.  After an additional postponement to May 25, an evidentiary hearing was held before a Department Complaint Hearing Board ("the Board").  The Board was composed of Simon Edwards, Joseph Pennell and Stanley Friedman, all originally named, but subsequently dismissed, as defendants in this lawsuit.  The Board was empowered to make a recommendation, based on the evidence presented at the hearing, as to whether Hopkins had committed the offenses charged and, if so, what penalty was appropriate.  At the close of the hearing, the Board concluded Hopkins had violated the conduct code and recommended that he be dismissed from the Department.[13]

■ Shortly thereafter, Hopkins was given an opportunity to present his position to a three member "appeal" panel composed of Dennis Regan, then Chief of Police, Randolph De Campli, then Vice President of the Fraternal Order of Police, and Albert Carter, Deputy Director of Personnel.  The panel was authorized under Department rules to make a final determination of Hopkins' fate in the Department.  The panel failed, however, to review the tape or a transcript of the evidence presented to the Board.  Moreover, as this Court observed on summary judgment, Chief Regan evaluated Hopkins' presentation under the misconception that the Complaint Hearing Board had concluded Hopkins was selling and using drugs.  Given this misapprehension, the Court held that the appeal panel did not comport with the level of fairness demanded by the Constitution and ordered that a trial be conducted to determine whether an appeal panel not operating under a misconception would nevertheless have reached the same conclusion.[14]

---

**11.**  Rule 201 states: "No member of the Department of Police shall engage in any conduct specifically prohibited in these rules, or contrary to lawful written or verbal orders or memorandum, or which is prejudicial to the good order, discipline or efficiency of the Department of Police."  PX 5.

**12.**  PX 5. Hopkins was also charged with possession of phentermine, a controlled substance.  The members of the administrative hearing board concluded that this charge was not substantiated.  That determination is not at issue in this litigation.

**13.**  The Board's finding declares that the charge was "substantiated, that being the preponderance of evidence presented indicating Sgt. Hopkins' location and availability of the drug, marihuana, and testimony of witnesses in his defense indicating use of this drug.  Recommendation of the Board is dismissal from the Department of Police."  DX 5A.

**14.**  While the summary judgment motions were pending, defendants submitted a letter brief informing the Court that the Unemployment Insurance Appeal Board had determined as a factual matter that Hopkins had been in knowing possession of marijuana.  The letter also noted that the Unemployment Appeal Board's decision had been affirmed by the Superior Court of Delaware. *See Hopkins v. Unemployment Insurance Appeal Board,* No. 83A–OC–13 (Del.Super. Oct. 25, 1984).  Defendants contended that the Superior Court's decision should be given preclusive effect against several of the issues pending in this forum.  The Court observed that the question of issue preclusion had not been subjected to the adversarial process and should await trial on the merits.  *Hopkins v. Mayor & Council of Wilmington,* 600 F.Supp. at 555 n. 34. In defendants' post-trial brief, this issue was relegated to a footnote alerting the Court to the fact that issue preclusion was still a live issue.  Defendants' Answering Post-Trial Brief, Dkt. 88 at 4 n. **.  While I question how seriously defendants make this argument given its cursory treatment in the briefing, I note that the issue decided by the Unemployment Appeal Board and affirmed by the Delaware Superior Court is

*Hopkins v. Mayor & Council of Wilmington*, 600 F.Supp. at 553, 555.

## II. The Issues Presented

■ The Constitution generally requires that before a permanent public employee may be terminated from his or her position, some type of hearing must be held. *Cleveland Board of Education v. Loudermill,* —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). When the responsibility for conducting the hearing is delegated to someone other than the actual decision maker, there must be "some assurance that the information tendered [at the evidentiary hearing] was before the decision-maker in some form prior to the decision." *Hawkins v. Board of Public Education,* 468 F.Supp. 201, 210 (D.Del.1979); *cf. Guerrero v. State of New Jersey,* 643 F.2d 148 (3d Cir.1981) (per curiam) (administrative decision maker may render final decision based upon delegated official's finding of facts and conclusions of law, coupled with plaintiff's written objections and oral argument). With this principle in mind, trial of this matter began with the playing of the tapes of Hopkins' evidentiary hearing. The information contained in these tapes, together with the tangible evidence introduced during the administrative proceedings, provide the basis for the Court to determine whether the outcome of Hopkins' case would have been the same had proper procedural safeguards been employed.

### A. *Evidence of the Conduct Violation*

■ Hopkins maintains that the uncontroverted evidence presented at his hearing

not the issue that faces this Court. The Unemployment Appeal Board independently adjudged whether Hopkins knowingly possessed marijuana based on evidence presented at an Unemployment Board hearing. This Court must now decide whether an impartial police review board would have concluded Hopkins knowingly possessed marijuana and would have ordered his dismissal. While the distinction may be slight, it is sufficient to prevent the application of any preclusion doctrine in this case.

15. DX 1, Hopkins at 12, 20.

16. DX 1, Nancy Carter at 68.

establishes that he was neither personally involved with drugs nor aware of Nancy Carter's marijuana use or possession. He contends that but for the flaws in the Police Department procedures, he would not have been found guilty of the internal charges against him in the face of testimony absolving him of any wrongdoing. Hopkins' argument assumes that the testimony presented in his favor was worthy of the decision maker's belief. To the contrary, the Court finds that an impartial decision maker would reject Hopkins' explanation as untrue and find his witnesses lacking credibility.

At the hearing, Hopkins testified he was confident Nancy Carter was not engaging in unlawful drug activity because he was with her "constantly" during his off-duty hours.[15] Given the extent of their time together, it is unreasonable to believe that Hopkins, a veteran police officer, would be unaware of Carter's five "joint" per day marijuana habit.[16] Certainly Hopkins would have recognized that Carter was often "high" and would have detected the smell of marijuana smoke in his midst.[17] Indeed, one would have expected Hopkins to be particularly sensitive to these signs of Carter's drug use in light of his knowledge of Carter's prior relationship with a neighborhood drug dealer, and given the warning Hopkins received from his friend, Charles Warrick, concerning Carter's continued involvement with drugs.[18]

Hopkins' proclaimed ignorance of the drugs in Nancy Carter's room is belied by

17. Shirley Carter, Nancy's sister, testified she was sure Hopkins didn't know Nancy had marijuana "[b]ecause every time that we would be smoking a joint or something and he like comes up toward the door, my sister would break her neck trying to hide it from him." DX 1, Shirley Carter at 6. It is inconceivable that a police officer could repeatedly walk into a room where people had just been smoking marijuana and not appreciate what had been going on. Moreover, it is difficult to believe that Nancy succeeded in hiding the marijuana from Hopkins on all but the one occasion when the police entered the scene.

18. DX 1, Hopkins at 12, 20, 43.

the existence of marijuana in plain view.[19] Carter's attempt to explain the presence of the marijuana is unconvincing. According to Carter, she and Hopkins were asleep when her sister Shirley awakened her in the early morning and asked her to share a joint. Carter obliged, and the two allegedly smoked the drug in Shirley's bedroom. Carter then returned with the marijuana roach in an ashtray, purportedly intending to rejoin her sister for a second joint after she made certain Hopkins was asleep.[20] Instead, she set the ashtray on the floor next to Hopkins' side of the bed and unwittingly dozed. She also left a shoe box lid with a quantity of marijuana and rolling papers in plain sight on a shelf next to the bed.[21] Ordinarily, Carter stated, these items were hidden under the bed, out of Hopkins' sight.[22] But on that morning, when the police entered the room, the ashtray and the box top were still where she had left them—in plain view next to where Hopkins was sleeping. Such careless conduct on the part of Carter is hardly consistent with her claim that she took great pains to prevent Hopkins from learning of her marijuana use and appears to be a poor attempt to refute the obvious inference that there was no need to hide the drugs because Hopkins was aware of their presence.

The substantive weakness of Hopkins' defense was exacerbated by the absence of conviction among the witnesses who testified on his behalf. Their overall lack of veracity was most apparent when they were questioned about the frequency of Hopkins' visits to the Carter residence. Both Nancy and Shirley Carter testified that Hopkins spent the night there no more than once or twice per week.[23] When Shirley was asked why she had previously stated Hopkins spent three or four nights per week at the Carter home, she replied that the earlier statement must have been a lie.[24] Similarly, Nancy Carter was unable to explain where Hopkins stayed when he did not sleep at her house and could only respond that Hopkins stayed "everywhere."[25]

Hopkins himself averred that when he was not sleeping at Nancy's he stayed "here and there"—with his grandmother, his ex-wife, his former girlfriends and his co-worker, Charles Warrick.[26] Warrick testified, however, that although Hopkins had keys to his house, he had seen Hopkins there perhaps four or five times during the six months preceding Hopkins' arrest, that after January, 1982, his house had no furniture in it, and that if he wanted to find Hopkins he would look for him at Carter's residence.[27] Finally, Hopkins' claim that

---

**19.** When police entered the room they found in plain view an ashtray containing one roach, a shoe box lid holding a bag of marijuana and another marijuana cigarette, and some white powder on a mirror on top of Carter's dresser. Other items were less readily visible. A small vase containing 261 roaches was found on a shelf near the bed. The shelf was cluttered with items and it was difficult to see into the vase itself because of its narrow neck. A plastic milk crate stood next to the bed on the side where Hopkins was sleeping. Pushed to the back of the crate among several other items was a peanut can containing marijuana seeds and bits of a marijuana plant. Police also found two closed shoe boxes containing manila envelopes, small clear plastic bags, straws, pipes, and a weighing spoon. A small scale was also found on top of Carter's dresser, again in the midst of other belongings. DX 1, Huston at 4–7; Nancy Carter at 21–22. Hopkins denied ever having seen any of these items.

**20.** One cannot help but wonder why, if Carter was checking to see if Hopkins was still asleep,

she would have carried the joint and ashtray back to her bedroom, rather than leave it hidden with her sister. Certainly if she feared Hopkins might have awakened, and if she truly did not want her marijuana habit to be detected, she would not have risked being caught "red handed" as she walked into the bedroom carrying the contraband.

**21.** DX 1, Nancy Carter at 5–6, 16–18.

**22.** *Id.* at 17.

**23.** DX 1, Shirley Carter at 11, Nancy Carter at 7–8, 78–80.

**24.** DX 1, Shirley Carter at 12–13.

**25.** DX 1, Nancy Carter at 80.

**26.** DX 1, Hopkins at 21.

**27.** DX 1, Warrick at 17, 22, 24.

he stayed with his ex-wife and past girlfriends contradicts his contention that he and Nancy were together constantly.[28]

In short, one is left with the clear impression that the testimony presented at Hopkins' hearing was little more than a series of lies and half-truths. It follows, then, that in the absence of a plausible defense, the members of an impartial Department tribunal would draw the obvious conclusion that Hopkins knew of the drugs in his presence and failed to act, in light of that knowledge, in a manner befitting a police officer.

### B. *The Appropriate Penalty*

■ Plaintiff argues that even if an impartial tribunal would have found him in violation of the police conduct code, it would not have ordered him dismissed from the force. Hopkins contends he was dismissed only because the panel that reviewed his case erroneously believed he had been selling and using drugs. He submits that based on his years of service on the force and his passive role in the events which precipitated his arrest, an impartial decision maker would have imposed a more lenient penalty. The Department argues, however, that drug offenses always require dismissal without regard for the degree of involvement or length of service of the employee.

At trial, both parties introduced evidence of the treatment afforded other officers who had violated the conduct code. This evidence provides only a rudimentary basis for comparison since the Department presented no evidence of a case on all fours with Hopkins' circumstances. To the extent that the evidence admits of some generalization, two patterns emerge. First, at least in non-drug related cases, the Department has weighed longevity of service in the officer's favor in assessing a penalty for a conduct code infraction. No case was proffered where an officer with more than seven years of service was severed from the force unless he was permitted to retire on pension based on years of service or disability.[29] In contrast, a number of junior officers were discharged for a range of offenses.[30]

Second, in every case where drugs were involved, the officer was either forced to resign or terminated from the police force.[31] However, none of the drug-related cases involved an officer with more than six years of service.[32] Hopkins' case is

---

28. DX 1, Hopkins at 20, 21.

29. Captain Preston J. Hickman, commanding officer of the Internal Affairs Division of the Department was deposed at length concerning prior conduct code violations. *See* PX 9. He testified, for example, that three officers with service varying from nine to twelve years had falsified time records to show they were working when in fact they were not. Two of the three were given penalty time and the third and most senior of the group was reduced in rank and eventually retired on pension. *Id.* at 46–50. Another officer was found to have stolen bullets while performing an off-duty bank security job. He had eleven years of past service and was suspended for a period without pay and given penalty time. *Id.* at 43–44; E–4. A relatively senior officer involved in alcohol-related offenses was permitted to resign and collect a disability pension based on his alcoholism, PX 9 at 26–30, E–13; and a twenty-year veteran who submitted approximately $1000 worth of false overtime claims repaid the money, retired, and began receiving his pension, PX 9 at 50–58, Tr. at E–15. Hopkins does not deny that these officers were entitled to the pensions they received and that unlike the officers mentioned above, Hopkins did not satisfy the disability or longevity requirements to entitle him to a pension at the time of his discharge.

30. *See, e.g.,* PX 9 at 62–64 (seven-year veteran fired after twice having been found engaging in sexual relations during work hours); *Id.* at 66–67, Tr. at E–14 (officer with one year of service forced to resign after patronizing a prostitute while off-duty); PX 9 at 69–70 (three-year veteran forced to resign after playing with loaded revolver during roll call).

31. PX 1 at 7–12; Tr. at E–4 to 13, 48.

32. Captain Hickman reported one case which was similar to the Hopkins matter except with respect to years of service. In that case, an officer who had served on the force for three years attended a party where others (including two fellow police officers) were smoking marijuana. The officer was faulted for his failure to report that offense as well as for making sexual advances to a woman at the party. He resigned at the Department's urging and the case was never brought for an administrative hearing. PX 9 at 7–10, E–48. The two officers who were with him at the party and who were seen to have been smoking marijuana were also forced

unique in that it involves a relatively minor drug offense committed by a long-term employee.

Other testimony elicited at trial is indicative of how Hopkins would have been treated by an impartial Department decision maker. The evidence establishes that members of the Department generally perceived drug offenses to be more serious than other offenses and understood that the former warranted dismissal from the Department irrespective of length of service. The most telling evidence of this fact comes from Hopkins' own testimony. On cross-examination, Hopkins was asked whether he knew he would lose his job if he was found in possession of marijuana. He responded, "Yes, if it were my marijuana and I possessed and knowed [sic] it was there, then I would have expected I would have lost my job." [33] Hopkins testified further that he knew he could be fired for possession of marijuana, even in the absence of witnesses establishing he had the drug on his person. [34]

Similarly, Officer Hickman, the Commanding Officer of the Internal Affairs Division, which coordinates and supervises internal disciplinary matters, testified he was virtually certain an officer would be fired for any involvement with drugs, be it use, possession, or sale. [35] Hickman explained that a drug offense was considered more serious than other conduct code violations because it not only involved unlawful conduct, but necessarily required at least one other individual to facilitate the illegal activity. Moreover, Hickman believed an officer engaging in any type of drug activity was exposed to a "different element" of

people and compromised his or her ability to perform police duties. [36]

Inspector Friedman and Captain Pennell, both of whom served on the Complaint Hearing Board, expressed similar views. According to their testimony at trial, they believed that if either charge against Hopkins was substantiated, [37] they would have no choice but to recommend his dismissal. [38] Their testimony, as well as the testimony of Hopkins and Hickman, is consistent with the Department's unblemished history of terminating employees who were found to be in any way involved with drugs.

In sum, the evidence as a whole compels the conclusion that Hopkins would have been discharged even if proper procedures had been followed.

### C. *Equal Protection and Substantive Due Process*

Hopkins contends that his dismissal from the Department violates his right to equal protection of the laws and substantive due process. He argues that the Department is required under the Constitution to treat those similarly situated equally. Hopkins maintains that he must be compared to other long-term employees disciplined for conduct code violations and not to other more junior employees discharged for substantially more significant drug activity. Since the Department has never dismissed an employee in the former group, Hopkins urges that his dismissal constitutes a denial of equal protection and substantive due process. [39]

While Hopkins is correct in his assertion that those similarly situated must be treated equally, the Constitution does

---

to resign. They had three and five years of past service, respectively.

**33.** Tr. at D–64.

**34.** Tr. at D–77.

**35.** PX 9 at 34.

**36.** *Id.* at 35.

**37.** In addition to the marijuana charge, Hopkins had also been charged with possession of phentermine. *See supra* note 12.

**38.** Tr. at E–65, 73, 81, 117.

**39.** Hopkins has withdrawn his claim that the Department violated his right to privacy. The basis for any remaining substantive due process claim is not clearly set forth in his post-trial briefs. It appears that his substantive due process and equal protection arguments are intertwined and have therefore been dealt with simultaneously by the Court.

not require that they be treated identically. *Zeigler v. Jackson,* 638 F.2d 776 (5th Cir. 1981). So long as the distinction is not based upon a suspect classification and does not affect a fundamental right, it is only necessary that the difference in treatment be fair, not arbitrary, and be predicated on some rational purpose. *See Lewis v. Delaware State College,* 455 F.Supp. 239 (D.Del.1978); *see also Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (no fundamental right to government employment).

■ In this case, defendants have shown that the Department has assessed penalties for conduct violations based on a variety of factors including years of service and the nature and severity of the offense. Members of the Department have explained that drug offenses warrant dismissal from the force, irrespective of an officer's seniority. Plaintiff can point to no case where an officer charged or convicted of a drug offense has received more moderate treatment. His assumption that he has been treated differently from others "similarly situated" is therefore questionable.

Even if plaintiff is compared to other senior officers, rather than to other drug offenders, it cannot be said that the distinction in treatment lacks a rational relationship to effective Department operations. The imposition of varying punishments for varying offenses requires a value judgment that this Court is not at liberty to make. As defendants' witness noted in his testimony, possession of drugs almost inevitably involves at least one other individual and means that the officer has ignored the criminal conduct of another. Given these distinctions between drug-related violations and other infractions of the conduct code, it is apparent that the Department's policy to dismiss all drug offenders, regardless of years of service or the severity of the particular drug offense, bears a rational relationship to the legitimate objective of maintaining a competent, law-abiding police force. It follows that Hopkins' dismissal violates neither his right to equal protection nor his right to substantive due process.

### D. *Official Immunity*

On summary judgment, plaintiff prevailed on his claim that his right to procedural due process was violated, both because his suspension without pay was effectuated without notice of the charges against him or a timely hearing, and because the hearing which he finally received was constitutionally deficient. Before the Court may address plaintiff's claim for damages for these procedural infractions, it must first consider whether any of the individual defendants are immune from liability.

Under the standard articulated by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [40] *Id.* at 818, 102 S.Ct. at 2738. That standard requires the Court to delve separately into the procedural violations that occurred.

■ First, Hopkins was suspended without pay immediately after his arrest on drug charges. His suspension, and ultimately his dismissal, were based on the fact that his conduct was in violation of the police conduct code, yet notification of that fact was not offered until some three and one-half weeks after his suspension. Moreover, an opportunity for Hopkins to air his side of the story did not arise until May 25, 1982. By that time, Hopkins had been without salary for two months.

The Court finds that the Department's handling of the matter violated Hopkins' clearly established constitutional rights. While the law has never required that a

---

**40.** The *Harlow* case involved a federal official sued directly under the Constitution. The Supreme Court noted, however, that there was essentially no distinction between the qualified immunity standard applied in such a case and the standard applied in an action against an official sued under section 1983. *Harlow,* 457 U.S. at 818 n. 30, 102 S.Ct. at 2738 n. 30.

full evidentiary hearing be held before a municipal employee may be suspended, it has long been recognized that at least some form of notice and a hearing, tailored to the specific demands of the situation, must be afforded prior to or immediately after deprivation of a significant property interest. *See Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). Indeed, even when the suspension from employment is only temporary in nature, at least an informal confrontation has been deemed necessary to pass constitutional muster. *See Hayes v. City of Wilmington,* 451 F.Supp. 696 (D.Del.1978); *Aiello v. City of Wilmington,* 426 F.Supp. 1272 (D.Del.1976). Here plaintiff was without salary for twenty-five days before he was notified of the charges against him and was compelled to wait an additional five weeks before any sort of hearing was finally held. The law was sufficiently clear at the time of these events that a reasonable person would have known that this deprivation violated Hopkins' constitutional rights. It therefore follows that defendants Lamborn and Johnson, the officers responsible for Hopkins' suspension, are not shielded from liability under the doctrine of qualified immunity.[41]

■ Chief Regan's immunity defense must similarly fail. On summary judgment, it was determined that Chief Regan reviewed Hopkins' case under the belief that the Complaint Hearing Board recommended Hopkins be fired for selling and using drugs. However, Hopkins had never been charged internally with either the sale or use of drugs. At trial, Chief Regan admitted he neither listened to the tape recordings of the evidentiary hearing nor reviewed the physical evidence that had been presented. The logical inference to be drawn from these facts is that Regan failed to familiarize himself with the circumstances of Hopkins' suspension and the

terms of the trial board recommendation. He instead attended the review proceedings armed only with the prior knowledge he had obtained from his involvement in the criminal investigation against Hopkins. Regan's disqualification on the appeal panel stems not from his role in the criminal investigation per se, but from the fact that he acted upon unsubstantiated information gathered from the investigation, rather than on the information presented at the hearing. As the Court noted on summary judgment, and as has been clear under the law for some time, the decision to deprive one of a constitutionally protected interest must be made only on the facts of record. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). As a corollary, where the final administrative arbiter chooses to delegate the responsibility of holding an evidentiary hearing and analyzing the facts, he or she retains a duty to become acquainted with the evidence prior to rendering a final decision. *Hawkins v. Board of Public Education,* 468 F.Supp. 201, 210 (D.Del.1979). Since these principles were well established prior to the events in this case, Chief Regan is not immune from liability.

### E. *Damages*

■ Plaintiff seeks substantial compensatory and punitive damages for the violation of his constitutional rights. Since the Court has concluded that plaintiff's dismissal from the Wilmington police force was justified, plaintiff is entitled only to those damages which flow directly from the procedural due process violations. *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978). The parties agree that plaintiff is entitled to an award of back pay for the period during which plaintiff was suspended without notice and an opportunity to be heard. Plaintiff himself delayed the hearing for an

---

**41.** Once it is determined that the applicable law was clearly established at the time the violation occurred, the qualified immunity defense will "'ordinarily fail,' unless the defendant 'claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard.'" *Czurlanis v. Alba-*

*nese,* 721 F.2d 98, 108 (3d Cir.1983) (quoting *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39); *see also Meding v. Hurd,* 607 F.Supp. 1088 (D.Del.1985). Defendants have not attempted to prove that "extraordinary circumstances" are applicable with respect to any of the defendants in this case.

additional eleven work days beyond the delay caused by the Department. He is therefore entitled to recover his salary only for the remaining thirty-one work days lost before a hearing was finally held. The parties have stipulated that plaintiff would have been paid during the period of his suspension at an annual salary of $24,455 or $470.29 per 5-day work week. Plaintiff is therefore entitled to $2,915.80 in compensatory damages.

In addition, plaintiff is entitled to a nominal award for the procedural flaws in conducting the police appeal panel. The Court is not convinced, however, that any further compensatory damages are due. Although plaintiff has testified to his severe emotional distress, the Court is unpersuaded that any significant injury may be fairly attributed to the procedural violations themselves. Plaintiff has indicated he was generally aware of the reasons for his suspension despite the lack of formal notice and that in light of the pending criminal proceedings against him, he would have refrained from responding at an informal hearing had one been provided. Moreover, plaintiff testified that he believed the evidentiary hearing which resulted in a recommendation of his dismissal was diligently conducted.[42] Plaintiff has failed to establish that his emotional upset was proximately caused by the imperfection in the Department appeal panel review. Rather, it is evident from the testimony that any emotional distress stems from plaintiff's dismissal and his attendant financial and social difficulties and not from the procedural violations themselves.

Finally, while punitive damages may be awarded under section 1983 against municipal officials, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981); *Abraham v. Pekarski*, 728 F.2d 167 (3d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984), the Court finds insufficient basis for an award of punitive damages on these facts. Punitive damages are recoverable only upon proof by a preponderance of the evidence that the defendant acted with ill will or reckless indifference to another's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Abraham v. Pekarski*, 728 F.2d at 173. Plaintiff in this case has failed to satisfy that burden.

In sum, plaintiff is entitled to back pay totalling $2,915.80 for the period of his suspension and to an additional nominal award of one dollar for the denial of a constitutionally adequate hearing. His other claims for damages have not been substantiated and shall not be awarded.

An order will be entered consistent with this Opinion.